**INDUSTRIAL BUILDING MATERIALS, INC., a corporation, Plaintiff,**

v.

**INTERCHEMICAL CORPORATION, a corporation, and Martin-Marietta Corporation, a corporation, Defendants.**

No. 64–432.

United States District Court
C. D. California.

Dec. 26, 1967.

**942**

George W. Jansen, Paul B. Wells, and Procopio, Cory, Hargreaves & Savitch, San Diego, Cal., for plaintiff.

G. Richard Doty, Kenneth E. Owen and McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for defendant Interchemical Corporation.

Gordon F. Hampton, Stephen C. Taylor, Don T. Hibner, Jr., and Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., for defendant Martin-Marietta Corporation.

DECISION ELIMINATING ISSUES, GRANTING DISMISSAL AND OR-DERING SUMMARY JUDG-MENT.

HAUK, District Judge.

This is an action to recover treble damages for injuries allegedly sustained by reason of violations of the antitrust laws by defendants. Jurisdiction is vested in this Court by Section 4 of the Clayton Act, Act of October 15, 1914, Ch. 323, § 4, 38 Stat. 731, 15 U.S.C. § 15.[1]

The Complaint was filed on March 18, 1964 in the Northern Division of the Southern District of California, and summons was issued thereon. That filing was in error, and on motion of plaintiff's counsel, the case was transferred to this Division of the Court on April 1, 1964.

The Complaint alleged in general terms that defendants Martin-Marietta Corporation and Interchemical Corporation had contracted, combined and conspired among themselves and with others unreasonably to restrain interstate trade and commerce in sealants, sealing compounds and other allied products in the United States and particularly in California, Arizona and Nevada, had in fact unreasonably restrained such trade and commerce, had attempted to monopolize such trade and commerce, had conspired to monopolize and had succeeded in monopolizing such trade and commerce, all in alleged violation of Sections 1 and 2 of the Sherman Act, Act of July 2, 1890, Ch. 647, §§ 1 and 2, 26 Stat. 209 as amended, 15 U.S.C. §§ 1[2] and 2.[3] Objects and purposes of the alleged conspiracy were described in general terms, and acts in furtherance of the alleged attempt to monopolize, conspiracy to monopolize and monopolization were similarly generally described.

---

1. 15 U.S.C. § 15:
 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

2. 15 U.S.C. § 1:
 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal:

3. 15 U.S.C. § 2:
 "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

Plaintiff was alleged to have been a distributor of the products of the Presstite Division, a manufacturer of sealants, sealing compounds and allied products, which had been owned by defendant Martin-Marietta Corporation until July 1, 1963 and was owned by defendant Interchemical Corporation thereafter. Plaintiff was alleged to have been injured by reason of such alleged violations of the antitrust laws in that its business of distributing Presstite products was destroyed. Damages aggregating $530,000 (trebled: $1,590,000) were claimed.

By a second count, the Complaint alleged that defendants had violated section 2 of the Clayton Act, as amended by the Robinson-Patman Act, Act of October 15, 1914, Ch. 323, § 2, 38 Stat. 730; amended June 19, 1936, Ch. 592, § 1, 49 Stat. 1526, 15 U.S.C. § 13(a),[4] by discriminating in price between different purchasers of commodities (sealants, sealing compounds and allied products) of like grade and quality, etc.

(generally following the language of the statute). Such conduct of defendants was alleged to have caused injury to plaintiff's business, apparently the same injury as that mentioned in the first count, and damages of $530,000 (trebled: $1,590,000) were claimed.

In accordance with the current trend in complaints in cases of this kind, the complaint described the allegedly unlawful conduct of defendants only in terms of "ultimate facts". No specific acts, occurrences or events were described or identified; no persons other than defendants and plaintiff were identified; no particular sales were singled out as being unlawful. In short, although it was satisfactory as an opening pleading, the Complaint gave no clue at all as to the particular acts and conduct of defendants which the "ultimate facts" alleged in the Complaint were intended to describe.

Defendant Interchemical promptly served and filed interrogatories to plaintiff inquiring in detail about the

---

4. 15 U.S.C. § 13(a)

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided*, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: *Provided, however*, That the Federal Trade Com-

mission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established: *And provided further*, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: *And provided further*, That nothing herein contained shall prevent price changes from time to time wherein response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned."

acts, occurrences, events, persons, agreements, etc. to which the various averments of the Complaint were directed. Plaintiff made no real attempt to answer any of the interrogatories directed to the alleged unlawful conduct, responding instead to each of such interrogatories with a formula "answer" which stated that, in the absence of discovery, plaintiff was not prepared to formulate a trial plan and formulate its evidence, and referred defendants back to the complaint. Of course, plaintiff's response was simply a refusal to answer the interrogatories, in complete disregard of the Rules, and Judge Byrne, to whom the case was then assigned, treated it as such. He was sharply critical of plaintiff's conduct (e. g. Transcript, June 15, 1964 p. 7), described the purported answers as "insolent" and "inherently improbable" (Id. at 12) and ordered plaintiff to answer those interrogatories "fully and fairly, with no further evasion" (Id. at 16, Order of June 18, 1964).

Plaintiff's further answers to interrogatories continued in the non-responsive, evasive pattern of the original answers although the formula approach was abandoned, in complete disregard for both the Rules and the Court's Order. Judge Byrne, however, viewed these further answers charitably, regarding them as an admission that plaintiff then had no information responsive to the interrogatories. Taking the practical approach that proper answers directly responsive to the interrogatories, which expressly admitted that plaintiff had no information, would not advance the case, he denied Interchemical's motion for further answers.

By an amended Complaint, dated July 16, 1964, plaintiff essentially restated its original Complaint, increasing its claimed damages to $830,000 (trebled: $2,490,000). On motion of Martin-Marietta, two portions of the Amended Complaint were stricken as irrelevant. Defendants answered, admitting certain facts about the respective businesses of the parties, the ownership of the Presstite Division, and the relationships between the parties, and denying the allegations respecting violations of the law and injury to plaintiff.

Fairly extensive discovery by all parties followed, without further intervention by the Court, the parties successfully resolving their differences by stipulation.

On April 5, 1966, apparently pursuant to discussions between the parties respecting procedures for defining issues for trial, plaintiff served (and filed on April 6) a "Statement of Contentions". Although that document was fairly explicit regarding the course of dealings between plaintiff and defendants, it continued to charge defendants with unlawful conduct in the most sweeping terms, without disclosing the particular acts, occurrences, events, parties, etc. upon which such charges were based.

Interchemical then propounded a second set of interrogatories to plaintiff, filed April 27, 1966, which inquired in detail about the facts supporting the various claims of misconduct by defendants made in the Amended Complaint and the Statement of Contentions. Plaintiff's time to answer those interrogatories was extended by a series of stipulations, successively, to May 31, 1966, June 15, 1966, July 1, 1966, and August 5, 1966. On August 15, 1966, the parties appeared before this Court for preliminary pretrial conference, the case having been transferred from Judge Byrne via Judge Whelan to Judge Hauk. Plaintiff was then 10 days in default with respect to its answers to interrogatories, following expiration of the last preceding extension. At that conference, the Court, after consulting with counsel for all parties, fixed a schedule for further proceedings which, among other things, ordered plaintiff to answer Interchemical's interrogatories by September 15, 1966 and at the same time to serve and file a statement of contentions and description of documentary materials and oral testimony to be offered at the trial (Order of August 26, 1966).

On October 6, 1966, when plaintiff was about three weeks in default under the foregoing order, at the request of counsel for plaintiff, and with defendants' consent the Court continued all of the dates in the aforesaid order approximately four weeks, extending plaintiff's time to answer interrogatories, etc. to October 10, 1966. On October 20, when plaintiff was 10 days in default, and pursuant to stipulation dated October 11, when plaintiff was in default, the Court continued all of the dates in said order by approximately five more weeks, extending plaintiff's time as aforesaid to November 14, 1966.

On November 15, 1966, one day late, plaintiff mailed to defendants a first installment of its response to Interchemical's interrogatories, and on November 22, 1966, eight days late, it mailed the remainder. Apparently plaintiff regarded the response to Interchemical's interrogatories as being equivalent to the statement of contents and description of documentary evidence and oral testimony proposed to be offered at the trial which the Court had ordered plaintiff to serve and file by its Orders of August 26, October 6 and October 20, 1966, for it filed nothing further.

Plaintiff's paper was entitled "Plaintiff's Answers to Interrogatories of Defendant Interchemical Corporation", and this was fortunate, for otherwise it could not have been identified as such. It was not responsive to a single one of the interrogatories, and it did not purport to be responsive or to comply with the Rules applicable to answers to interrogatories. In lieu of answering the interrogatories separately as required by Fed.R.Civ.P. 33, plaintiff submitted a two volume Narrative and four appendices, in ten volumes, which it claimed "portray the full mosaic of the case" (Narrative, p. 8, line 11) and "relate all of the evidence which plaintiff will utilize at the trial of this case" (Id. at p. 10, lines 14–15). As might be expected, Interchemical moved promptly for proper answers and sanctions, taking the position that proper answers were essential to the identification and elimination of false issues and the adequate framing of issues to be tried.

As indicated above, plaintiff's purported answers to interrogatories were clearly and wholly improper under the Rules. There was no question but that, under the Rules, Interchemical was entitled to have its interrogatories answered. Nevertheless, when the matter came on for hearing (December 12, 1966), the Court expressed its own view that as a practical matter plaintiff's Narrative and supporting documents might prove to be as satisfactory as proper answers to interrogatories for the identification and elimination of false issues and the definition of issues to be tried. The Court suggested that, in lieu of insisting on proper answers to its interrogatories, Interchemical consider a motion for summary judgment based on the Narrative, etc., perhaps supplemented by requests to admit or further interrogatories addressed to the Narrative, etc., if needed. (e. g., Transcript, December 12, 1966, pp. 19–22).

Counsel for plaintiff then proposed (Id. at p. 31, lines 2–18):

"That this [the Narrative and supporting Appendices submitted in response to the interrogatories] is a • statement of our case, that he [counsel for Interchemical] file a motion directed to limiting the issues, as specified in this fashion—move to eliminate under Section 1 of the Sherman Act contract as an unreasonable restraint of trade, combination as an unreasonable restraint of trade, conspiracy as an unreasonable restraint of trade. Under Section 2, monopoly itself, then conspiracy to monopolize, and then attempt to monopolize. And I will endeavor to forthrightly meet each one of those points.

"Where I haven't got a case and I am sure I haven't, I will frankly admit so. If I think I have got something to hang my hat on, I will try to point it out very carefully.

"I think we can resolve the whole thing this way."

This proposal of plaintiff was accepted by the parties and the Court, and a schedule to implement it was fixed. That schedule, embodied in the Order of January 4, 1967, required defendants to file their motion by January 16, 1967, required plaintiff to file its response by February 13, 1967, and required defendants to reply by March 13, 1967. On January 13, 1967, defendants served and filed their Motion to Eliminate Issues, which stated 30 possible issues, some with several subparts, suggested by the Amended Complaint or the Narrative. On March 1, 1967, two weeks late, plaintiff served its Preliminary Response to the motion, admitting that five of the possible issues could be eliminated, but stating simply that it made all the rest of the claims mentioned in the Motion. On March 17, 1967, when plaintiff was more than a month in default, the Court, being advised that matters beyond the control of counsel for plaintiff had prevented counsel from filing the response to defendants' motion ordered to be made by the Order of January 4, 1967, made an order requiring plaintiff to respond by April 15, 1967, requiring defendants to reply by May 15, 1967, fixing May 22, 1967 for the hearing, and admonishing counsel that the Court did not expect to modify the schedule.

On April 18, 1967, 3 days late, plaintiff served and filed a document entitled "Plaintiff's Supplemental Response (and Factual Basis in Support Thereof) to Defendants' Motion to Eliminate Issues" (Supplemental Response). Although plaintiff's papers may have complied with the literal terms of the Court's order ("file such response or responses as it deems advisable"), the two papers taken together did not even resemble the performance which plaintiff promised when it suggested the procedure. Plaintiff was forthright enough as to the five issues it admitted should be eliminated, but as to the rest, it wholly failed to state the facts to support its claims or admit the issues should go out. On May 15, 1967, defendants served and filed their Memorandum in Support of Motion to Eliminate Issues, as well as three extensive exhibits which supplied copies and summaries of documents to which plaintiff had referred and which summarized data appearing on invoices which plaintiff had cited.

At the hearing on May 22, 1967, the Court indicated its general disposition to grant defendants' motion in most respects because plaintiff had failed to show that any genuine issues existed for trial, i. e., plaintiff had failed to show a reasonable possibility that it could prove a prima facie case as to those issues, even assuming that all the documents it cited and all the testimony to which it referred were admitted in evidence. (Transcript, May 22, 1967, pp. 3–6, p. 12, lines 18–21.) When invited to argue, counsel for plaintiff quoted at length from deposition testimony to which no reference had been made in any of plaintiff's earlier papers (Id. at pp. 15–18), referred to documents which had not been mentioned previously (Id. at p. 27, lines 11–12), and claimed a misunderstanding as to the showing the Court expected plaintiff to make to support its case (Id. at p. 27, lines 8–11; p. 28, lines 13–17, 21–25; p. 29, lines 7–18; p. 36, lines 11–14). The Court thereupon gave plaintiff a further chance to show that there was some reason to believe that it could prove a case with respect to the issues defendants had moved to eliminate, and the chance was given in a fair manner on entirely clear and unmistakable terms:

"THE COURT: I think this. I will say it again. Regardless of any misunderstanding, I hope there is no misunderstanding now.

"My understanding was that there would be a motion in which the issues to be eliminated would be set forth by the defendants, and then there would be a filing by the plaintiff to set forth all the evidence, all the pegs upon which the plaintiff could hang their hat or hats, with respect to each one of those issues. And that then

the court would look at it and say, well, there is not enough there to support that issue, out goes that issue; there is not enough to support that issue, out it goes; there is enough for this issue, it will stay in the case.

"That, apparently, wasn't the understanding of Mr. Jansen and Mr. Painter.

"But it is this time. This is the last round. As far as I am concerned, Mr. Jansen, if you don't do it this time, I will throw the issues out and let you go up on appeal.

"MR. JANSEN: What counsel is talking about is not the plaintiff. Plaintiff has the evidence—

"THE COURT: You haven't submitted it in the form I want it. Mr. Jansen, either you do it or I will throw the case out, let's get it clear. I am at that point.

"MR. JANSEN: All right.

"THE COURT: If you are not going to do it, say so now and I will throw it out right now.

"MR. JANSEN: No. I am prepared—

"THE COURT: What are you prepared to do?

"MR. JANSEN: I am prepared to take every item of evidence we have got, point it out in a memorandum, every single item of deposition, if I have to recopy them all, in order to bring it to your Honor's attention I will do it, and I will put it together so there will not be any mistake or misunderstanding as to the evidence, the testimony. And I will also try to allude to the inferences that can be drawn from that evidence." (Id. p. 58 line 2—p. 59, line 18)

"THE COURT:

\* \* \* \* \* \*

"I will give the plaintiff another period here within which to come up with specific summarizations of the evidence that the plaintiff has and intends to produce with respect to each one of these 30 issues that are still in issue. The first three are out, as I understand it, because plaintiff has already indicated now in his supplemental or in his preliminary response and supplemental response, that they are no longer issues in the case. That is, issues 1, 2 and 3. And I think issues 10 and 11. As to the remaining issues, I want to see what evidence the plaintiff has or plaintiffs have with respect to specific references to that evidence, where it can be found, in documents or depositions, or any other materials that are available. As to any issue we haven't got anything on, I will throw the issue out." (Id. p. 61, line 15—p. 62, line 5.)

The Court's Order Continuing Hearing and Fixing Schedule for Further Presentations, made June 1, 1967 and filed June 5, 1967, settled pursuant to Local Rule 7(a) without objection by plaintiff, was equally explicit as to what was expected of plaintiff:

"2. On or before July 1, 1967, plaintiff shall file with the Court and serve on defendants a Second Supplemental Response to defendants' Motion to Eliminate Issues. Such Second Supplemental Response shall address itself, separately, to each of the issues designated in defendants' Motion to Eliminate Issues, except the issues numbered 1, 2, 3, 10 and 11, heretofore eliminated by admission, and as to each such issue, separately, plaintifff shall either (a) admit that it cannot prove such a claim, or (b) make the showing in support thereof hereinafter described. If plaintiff intends to make any claim which is not adequately described in defendants' Motion to Eliminate Issues, plaintiff's Second Supplemental Response shall also state separately every such claim and make the showing hereinafter described with respect to it. Separately as to each claim which plaintiff intends to assert, whether described in defendants' motion or stated by plaintiff, plaintiff's Second Supplemental Response shall:

"(a) specify with particularity all of the evidence which plaintiff

has to support such claim, including all testimony, exhibits and documentary material;

"(b) state the facts in detail which plaintiff contends such evidence would prove; and

"(c) state the legal theory, with supporting authorities, which would justify a claim by plaintiff based on such facts and proof.

Failure to furnish the foregoing information fully and completely with respect to any claim shall constitute an admission by plaintiff that it cannot prove such claim and abandons such claim. Plaintiff shall furnish with or as part of its Second Supplemental Response copies of all documents to which reference is made therein and which were not included in Exhibit I to Interchemical Corporation's Memorandum in Support of Motion to Eliminate Issues." (Order, June 1, 1967, p. 3, line 23 to p. 4, line 26)

On July 6, 1967, 5 days late, plaintiff served by mail a document entitled "Oral Testimony and Documentary Evidence Supporting Plaintiff's Claim of Violations of the Antitrust Laws" (hereinafter referred to as "OTDE"). That document, although it encompassed 159 cap pages, bore absolutely no resemblance to the document ordered to be filed. It did not address itself to any of the issues framed in defendants' motion to eliminate issues, and it did not frame any other issue. It did not set forth with particularity or otherwise all of the evidence which plaintiff has as to any claim; quite the contrary, it twice stated that "of course" it does not include all the evidence (page 158). It did not state the facts which the disjointed quotations from depositions and documents of which it was composed purport to prove. It did not state the legal theory which would justify a claim by plaintiff based on such facts and proof. In short, the filing of that document by plaintiff was no less than an intentional refusal to comply with the order of the Court.

On July 14, 1967, defendants moved to dismiss the action, pursuant to Fed.R.C. P. 41(b), on the grounds (a) that plaintiff had failed to comply with the order of the Court, and (b) that, in view of the express terms of the Order of June 1, 1967, plaintiff had abandoned all claims, and the action should be dismissed for failure to prosecute.

Neither in its response to defendants' motion nor at the hearing thereon, July 31, 1967, did plaintiff offer any excuse for its failure to comply with the Court's order. It offered no apology for its conduct. It did not even see fit to request a further opportunity to comply. Quite the contrary, in its written Response to Defendants' Motion to Dismiss, served by mail July 26, 1967, 5 days after the expiration of the time prescribed by Local Rule 3(f) (1), plaintiff stated (at page 5, lines 5–14):

"In setting up its oral testimony and documentary evidence plaintiff had two courses open to it. One, to take defendants' so called issues and separately as to each set forth the oral testimony and documentary evidence supporting each item. * * * Or plaintiff could as it did set out the oral testimony and documentary evidence under general categories so that it might readily be applied to each of the so called issues."

That is, of course, simply a statement that plaintiff had the choice of complying with the Court's order, or of not complying, and it intentionally chose not to comply. Similarly, at the hearing, after the Court had indicated a disposition to grant the defendants' motion to dismiss, plaintiff's counsel refused to offer any argument, saying only "Your Honor, if that is your Honor's feeling, I don't think there is any point in spending a lot of time discussing it." (Transcript, July 31, 1967, p. 11, lines 1–2.)

With the case in this posture, the Court has reluctantly concluded that defendants' motion should be granted, and the case, the complaint and each and every cause of action and claim for relief therein contained should be dis-

missed with prejudice pursuant to Rule 41(b). The Court clearly has the power to dismiss for failure to prosecute or to comply with an order of the Court, both by the express provisions of Rule 41(b) and as part of its inherent powers. That power should, and indeed must, be exercised in appropriate situations to protect the integrity of the Court and its orders. Link v. Wabash R.R., 370 U.S. 626, 629, 82 S.Ct. 1386, 1388, 8 L.Ed.2d 734, 737 (1962); Fitzsimmons v. Gilpin, 368 F.2d 561, 562 (9th Cir. 1966); Agnew v. Moody, 330 F.2d 868, 870–871 (9th Cir. 1964), cert. denied, 379 U.S. 867, 85 S.Ct. 137, 13 L.Ed.2d 70 (1964); O'Brien v. Sinatra, 315 F.2d 637, 641, 642 (9th Cir. 1963); Hicks v. Bekins Moving & Storage Co., 115 F.2d 406, 408, 409 (9th Cir. 1940); Marshall v. Southern Farm Bureau Cas. Co., 353 F.2d 737 (5th Cir. 1965), aff'g 36 F.R.D. 186, 189 (W.D.La.1964), cert. denied, 384 U.S. 910, 86 S.Ct. 1352, 16 L.Ed.2d 363 (1966); Deep South Oil Co. of Tex. v. Metropolitan Life Ins. Co., 310 F.2d 933, 934 (2d Cir. 1962); Janousek v. Wells, 303 F.2d 118, 112, 113 (8th Cir. 1962); Maddox v. Shroyer, 112 U.S.App.D.C. 318, 302 F.2d 903, 904, cert. denied, 371 U.S. 825, 83 S.Ct. 45, 9 L.Ed.2d 64 (1962); Sandee Mfg. Co. v. Rohm & Haas Co., 298 F.2d 41, 42, 43 (7th Cir. 1962); Package Mach. Co. v. Hayssen Mfg. Co., 266 F.2d 56, 57 (7th Cir. 1959), aff'g 164 F.Supp. 904, 911–912 (E.D.Wisc.1958); Thompson v. Johnson, 102 U.S.App.D.C. 307, 253 F.2d 43 (1958); Societe Internationale Pour Participations Industrielles et Commerciales S.A. v. Brownell, 96 U.S.App.D.C. 232, 225 F.2d 532, 539–540 (1954), aff'g and modifying, Internationale Pour Participations Industrielles et Commerciales S.A. v. McGranery, 111 F.Supp. 435, 447 (D.D.C.1953), cert. denied, 350 U.S. 937, 76 S.Ct. 302, 100 L.Ed. 818 (1956); Blake v. De Vilbiss Co., 118 F.2d 346, 347 (6th Cir. 1941); Perovich v. Pipe Linings, Inc., 63–278–MP (C.D.Cal. May 25, 1967); Shakespeare v. Wilson, 40 F.R.D. 500, 505, 506 (S.D.Cal.1966); Martin v. Hunt, 29 F.R.D. 14, 16 (D. Mass.1961); Weiner v. City & County of Philadelphia, 184 F.Supp. 795, 796 (E.D. Pa.1960); Dalrymple v. Pittsburgh Cons. Coal Co., 24 F.R.D. 260, 262 (W.D. Pa.1959); United States ex rel. Shinn v. State of Tennessee, 74 F.Supp. 635, 637 (E.D.Tenn.1947). Cf. Commonwealth Edison Co. v. Allis-Chalmers, 245 F.Supp. 889, 900–901 (N.D.Ill.1965).

The Court is fully aware that dismissal of a case is a drastic remedy which by its nature cannot be appropriately applied to every case of failure to comply with an order of the Court. But this is not an ordinary case or even an ordinary failure to comply. This was not inadvertence. Plaintiff deliberately elected, and announced it had elected, not to comply with the Court's order in any respect; and even after the Court had announced a disposition to dismiss the case, plaintiff made no offer to comply and offered nothing to dissuade the Court from that course. Such calculated, deliberate disregard of the Court's authority and the force of its order, perhaps in character with the answers Judge Byrne had earlier termed "insolent", is so utterly inconsistent with the administration of justice and the orderly conduct of the business of the Court that it cannot be tolerated, condoned, or ignored. If the Court is to discharge its functions, its orders must be obeyed, and the Court has no choice when a party deliberately refuses to comply with an order, and persists in such refusal in the face of impending dismissal, but to utilize the remedy provided by Rule 41 (b) and dismiss.

The Court has been unable to find any other acceptable, less drastic, alternative to dismissal. The Court's order of June 1, 1967 was clear and unmistakable, as were the Court's oral instructions to plaintiff on May 22, 1967. Plaintiff's refusal is equally clear and unmistakable. A further order to the same effect, expressly on pain of dismissal for non-compliance, would obviously be a useless act in these circumstances. The last order provided expressly that non-compliance as to any claim would constitute an admission that the claim

could not be proved and an abandonment of the claim, which has essentially the same effect. The only available alternative would be to let plaintiff have its way and let it over-rule the Court, but that is not acceptable. Plaintiff has simply left the Court no choice. The case, the complaint and each and every cause of action and claim for relief therein contained should be dismissed.

MOTION TO ELIMINATE ISSUES

The "motion to eliminate issues" procedure which plaintiff proposed was adopted in order to determine whether any genuine issues existed for trial, to identify and define such genuine issues, and to dispose of all other possible issues. This was to place the case in a posture which would permit any remaining discovery and trial preparation to be completed promptly and efficiently by focusing on real issues only, permit a relatively early trial, and permit the trial to be conducted with dispatch. Such definition of the real issues was absolutely necessary to permit reasonable preparation by the parties and to keep the trial within reasonable bounds. The Complaint was of no value for that purpose, for it essentially charged defendants with violating most of the antitrust laws in a wide variety of ways, without any definition of particular conduct which was claimed to constitute such wrongdoing. No focus for preparation or trial was provided. No parameters for relevancy were available.

Plaintiff claimed repeatedly that its Narrative and supporting documents constituted its entire case, and asserted it was ready to go to trial. (E. g., Transcript, December 12, 1966, p. 12, line 24 to p. 13, line 1; p. 14, lines 15–16). As indicated above, the Court suggested that a motion for summary judgment, pursuant to Fed.R.Civ.P. 56, might be utilized to determine whether there were any genuine issues and to dispose of the rest. Such a procedure has been successfully followed in many cases, a few reported examples of which are: Holcomb v. Aetna Life Ins. Co., 255 F.2d 577, 580 (10th Cir. 1958), cert. denied, Fleming v. Aetna Life Ins. Co., 358 U.S. 879, 79 S.Ct. 118, 3 L.Ed.2d 110 (1958); Broderick Wood Prods. Co. v. United States, 195 F.2d 433, 435–437 (10th Cir. 1952); Berger v. Brannan, 172 F.2d 241, 243 (10th Cir. 1949), cert. denied, 337 U.S. 941, 69 S.Ct. 1519, 93 L.Ed. 1746 (1949); Biggins v. Oltmer Iron Works, 154 F.2d 214, 217 (7th Cir. 1946); Becker v. Safelite Glass Corp., 244 F.Supp. 625, 631 (D.Kan.1965); United States v. National City Lines, 118 F.Supp. 465, 467–468 (N.D.Ill.1953); Waldron v. British Petroleum Co., 38 F.R.D. 170, 173, 174 (S.D.N.Y.1965), aff'd sub nom. Waldron v. Cities Service Co., 361 F.2d 671, 672 (2d Cir. 1966), cert. granted, 385 U.S. 1024, 87 S.Ct. 743, 17 L.Ed.2d 672 (1967). Other courts have eliminated false issues by dismissal under Rule 16 when it appeared that plaintiff had no case. MacMaugh v. Baldwin, 99 U.S.App.D.C. 247, 239 F.2d 67, 68 (1956); Silvera v. Broadway Dept. Store, Inc., 35 F.Supp. 625, 627 (S.D.Cal.1940).

Plaintiff proposed a procedure which envisioned elimination of some issues by agreement, and rulings by the Court on whether plaintiff's evidence, described in the Narrative, etc., would suffice as a matter of law to sustain plaintiff's claims on issues not determined by agreement. Plaintiff's proposed procedure was wholly consistent with the purpose and effect of Rules 16 and 56 and, since the Narrative, etc., are essentially pleadings, this procedure resembled the motion for judgment on the pleadings mentioned in Rule 12(c). In the circumstances, plaintiff's procedure seemed to provide a more efficient and effective approach to the problem than could be achieved by following strictly the procedures expressly described by any of those Rules. For example, to require plaintiff to furnish affidavits with respect to the matters set forth in its Narrative, etc., or in the documents referred to therein would simply waste effort. Such matters are before us, and we are assuming them to be admitted in evidence. If they do not suffice to show the existence of a genuine issue as to any material fact in their present form

on that assumption, they could do no more if supported by a jurat and thereby rendered into affidavits.

Plaintiff's proposed procedure for the testing of its case was therefore adopted. So far as the Court is aware, the procedure is unique, but a certain amount of inventiveness is necessary if complicated cases are to be tried or if essentially simple cases are to be identified as such and not tried as if they were complicated. See, e. g., "Short Cuts" in Long Cases—The Report ("Prettyman Report"), 13 F.R.D. 41, 62, 66 (1951); Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 373, 389 (1960). The Rules expressly authorize the adoption of special procedures in special cases. Fed. R.Civ.P. 83 provides that "In all cases not provided for by rule, the district courts may regulate their practice in any manner not inconsistent with these rules", and Local Rule 23 is to the same effect.

Plaintiff has, of course, despite promises to the contrary, adamantly refused to follow the procedure which it proposed, and the Court adopted, taking the position that it is not required to "segmentize" its case. (E. g., Transcript, May 22, 1967, p. 60, line 25 to p. 61, line 1; p. 37, lines 13–22). This has severely hampered analysis of the case and the determination of the motion to eliminate issues on the merits.

Despite this, the Court has carefully reviewed plaintiff's entire submission: its Narrative, the various appendices to the Narrative, its Preliminary Response to the motion to eliminate issues, its Supplemental Response, and its Oral Testimony and Documentary Evidence Supporting Plaintiff's Claim of Violations of the Antitrust Laws ("OTDE"). The Court has also reviewed the documents to which plaintiff referred in its presentation, copies of which were supplied by defendants as Exhibit I to their memorandum in support of their motion, and the pricing data taken from invoices cited by plaintiff in its presentation, supplied by defendants as Exhibit III to their memorandum. Plaintiff has not challenged the correctness of either of such Exhibits which defendants furnished to supply factual material to which plaintiff referred, but which could not be ascertained from plaintiff's presentation.

Plaintiff has been given a full opportunity to place its case before the Court. When it developed at the hearing on May 22, 1967 that, despite plaintiff's earlier representations, the Narrative and appendices did not contain plaintiff's "entire case", the matter was continued, and plaintiff was not merely given an opportunity, but was expressly ordered, to present its entire case, everything it had. Package Mach. Co. v. Hayssen Mfg. Co., 266 F.2d 56, 57 (7th Cir. 1959), aff'd 164 F.Supp. 904, 911–912 (E.D. Wis.1958); Berger v. Brannan, 172 F.2d 241, 243 (10th Cir. 1949), cert. denied 337 U.S. 941, 69 S.Ct. 1519 (1949); McDonald v. Bowles, 152 F.2d 741, 743 (9th Cir. 1945); Becker v. Safelite Glass Corp., 244 F.Supp. 625, 631 (D.Kan. 1965); Mitchell v. RKO Rhode Island Corp., 22 F.R.D. 232, 234–235 (D.Mass. 1958); Maple Drive-In Theatre Corp. v. Radio-Keith-Orpheum Corp., 1957 Trade Cas. ¶ 68,666 (S.D.N.Y.1957). It filed its OTDE. At the hearing on July 31, 1967, the Court indicated that it could find nothing in the materials before it, including the OTDE, which would support a claim by plaintiff against defendants under the antitrust laws (Transcript, July 31, 1963, p. 12, lines 15–23). Even then, the Court offered plaintiff a further opportunity to offer proof, but plaintiff elected to stand on the record (Id. at p. 13, lines 7–19).

The Court has analyzed the entire case, both by reference to the issues defined by defendants in their motion and also as a "broad mosaic" to see whether plaintiff showed a claim on the merits. In that connection, it assumed that all of the documents and testimony to which plaintiff referred would be admissible and admitted in evidence to prove the truth of the matters stated or contained therein. This is a palpably unreasonable

assumption, for much of the testimony is obviously hearsay or beyond the scope of the witness' personal knowledge, and many of the documents are obviously not admissible for one or more reasons. Nevertheless, the assumption has been indulged, on the theory that the case should be tested on the most favorable facts plaintiff could hope to prove or which might be inferred from its proof, and if some of this evidence is not admissible, perhaps before trial ended plaintiff could find something else to the same general effect which would be admissible.

Similarly, the Court has viewed the evidence and the facts in the light most favorable to plaintiff, resolving all doubts in its favor, and drawing all possible inferences favorable to plaintiff.

 The test which the Court applied in determining whether there was a genuine issue for trial and in eliminating false issues was whether, taken as a whole and indulging all the aforementioned assumptions, the materials before the Court would constitute a prima facie case against defendants, or either of them. That is the test which would be applied if a jury had been impaneled, the materials were in evidence, and the Court were ruling on a motion for directed verdict. 5 Moore, Federal Practice ¶ 50.02 [1], at 2317 (2d ed. 1966); Gordon v. Illinois Bell Tel. Co., 330 F.2d 103, 106 (7th Cir. 1964), cert. denied, 379 U.S. 909, 85 S.Ct. 197, 13 L.Ed.2d 182 (1964); O'Brien v. Westinghouse Elec. Corp., 293 F.2d 1, 8 (3d Cir. 1961); Olympia Oyster Co. v. Rayonier Inc., 229 F.Supp. 855, 856 (W.D.Wash.1964); Independent Iron Works, Inc. v. United States Steel Corp., 177 F.Supp. 743, 746 (N.D.Cal.1959), aff'd, 322 F.2d 656, 661 (9th Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). The same test is properly applied in ruling on a motion for summary judgment on the ground that there are no disputed issues of fact and as matter of law plaintiff could not prevail and defendants are entitled to judgment. Duarte v. Bank of Hawaii, 287 F.2d 51, 54–55 (9th Cir. 1961), cert.

denied, 366 U.S. 972, 81 S.Ct. 1938, 6 L.Ed.2d 1261 (1961); Byrnes v. Mutual Life Ins. Co., 217 F.2d 497, 500 (9th Cir. 1954), cert. denied, 348 U.S. 971, 75 S. Ct. 532, 99 L.Ed. 756 (1955); Gifford v. Travelers Protective Ass'n., 153 F.2d 209, 211 (9th Cir. 1946); Neff v. World Publishing Co., 349 F.2d 235, 239 (8th Cir. 1965); Bolack v. Underwood, 340 F.2d 816, 819 (10th Cir. 1965); Elbow Lake Cooperative Grain Co. v. Commodity Credit Corp., 251 F.2d 633, 637 (8th Cir. 1958); Appolonio v. Baxter, 217 F. 2d 267, 270–271 (6th Cir. 1954); Zampos v. United States Smelting, Ref. & Mining Co., 206 F.2d 171, 173 (10th Cir. 1953); Durasteel Co. v. Great Lakes Steel Corp., 205 F.2d 438, 441 (8th Cir. 1953); Gibson v. Security Trust Co., 201 F.2d 573, 575 (4th Cir. 1953); Hurd v. Sheffield Steel Corp., 181 F.2d 269, 271 (8th Cir. 1950); Christianson v. Gaines, 85 U.S.App.D.C. 15, 174 F.2d 534, 536 (1949); Parmelee v. Chicago Eye Shield Co., 157 F.2d 582, 584–585 (8th Cir. 1946); Pen-Ken Gas & Oil Corp. v. Warfield Natural Gas Co., 137 F.2d 871, 877 (6th Cir. 1943), cert. denied, 320 U.S. 800, 64 S.Ct. 431, 88 L.Ed. 483 (1944); Cimijotti v. Paulsen, 230 F.Supp. 39, 42 (E.D.Pa.1964), aff'd per curiam, 340 F.2d 613 (8th Cir. 1965); Pittsburgh Hotels Ass'n v: Urban Redevelopment Authority, 202 F.Supp. 486, 487–488 (W.D.Pa.), aff'd, Hilton Hotels Corp. v. Urban Redevelopment Authority, 309 F.2d 186, 189–190 (3d Cir. 1962), cert. denied, 372 U.S. 916, 83 S.Ct. 730, 9 L.Ed.2d 723 (1963); Bass v. Southern Pac. Co., 196 F.Supp. 763, 765–766 (D. Or.1961); Bank of China v. Wells Fargo Bank & Union Trust Co., 104 F.Supp. 59, 62 (N.D.Cal.1952), aff'd and modified, 209 F.2d 467 (9th Cir. 1953); Kantarof v. Orsecki, 102 F.Supp. 196, 197 (S.D.N.Y.1952); Miller v. Hoffman, 1 F.R.D. 290, 292 (D.N.J.1940); 35B C.J.S. Federal Civil Procedure § 1147 (1960).

## ISSUES ELIMINATED BY AGREEMENT

In its Preliminary Response, plaintiff admitted that it did not make the claims

specified in issues numbered 1, 2, 3, 10 and 11 in the Motion to Eliminate Issues. The motion is granted as to those issues.

By reason of the foregoing admission, plaintiff admitted that Martin-Marietta and Interchemical did not contract, combine or conspire with each other or with their respective employees in violation of the antitrust laws. Each of the defendants participated in the matters to which this case relates, through and only through the Presstite Division when they respectively and successively owned it. This permits the case to be analyzed by reference to the conduct of the Presstite Division as if it were a separate entity and the sole defendant, for obviously if no claim could be sustained against the Presstite Division, no case could be made against either defendant, and that analytical method will be followed. Of course, if a claim could be sustained against the Presstite Division, then the question of which of the defendants was liable therefor would be presented, but since no such claim is found, the question does not arise.

### THE FACTS

Viewed in the light most favorable to plaintiff and indulging all inferences in plaintiff's favor, the Court finds that the materials before it could prove or reasonably support inferences of the following facts:

1. Martin-Marietta Corporation is a Maryland corporation qualified to do business in California, having its principal office in New York, New York. During all relevant times prior to July 1, 1963, it was the owner of the Presstite Division. Effective July 1, 1963, it sold the Presstite Division to Interchemical Corporation.

2. Interchemical Corporation is an Ohio corporation, qualified to do business in California, having its principal office in New York, New York. Effective July 1, 1963, Interchemical purchased the assets and business of the Presstite Division from Martin-Marietta, and it has continued to own such assets and to conduct such business from said date until the present. Following such purchase, Interchemical employed most of the persons who had theretofore been employed by Martin-Marietta in the conduct of the business of the Presstite Division.

3. The Presstite Division is the successor to the business of Presstite Engineering Company, a corporation, but at no relevant time has Presstite Division been a corporation separate from the corporation, Martin-Marietta or Interchemical, which owned its assets. The Presstite Division is and at all relevant times has been engaged in the business of manufacturing and selling sealing products and related products. It maintains manufacturing facilities at St. Louis, Missouri where its principal factory and main office is situated; Chicago Heights, Illinois; Jackson, Michigan; and El Segundo, California. The Presstite Division, considered apart from its corporate owner, is the largest manufacturer whose product is devoted substantially exclusively to sealing products and related products. The Presstite Division manufactures more different shapes, sizes and styles of sealing products and related products than any other manufacturer. The products of no one other manufacturer, or any combination of other manufacturers, would exactly duplicate the products of the Presstite Division. There are, however, other manufacturers and sellers of sealing products and related products who compete with the Presstite Division to supply products for the same end uses. There is some competition for every product of the Presstite Division, and much competition for some products. Some of the competitors compete only as to a few products, while others compete over a broader spectrum. Most of the products of the Presstite Division are sold under one or more trademarks owned by the Presstite Division including, but not limited to the trademark "Presstite".

4. Initially all of the Presstite products distributed in California, Arizona

and Nevada were manufactured at St. Louis, Chicago Heights, or Jackson. Prior to 1960, the Presstite Division acquired The Techkote Company and its manufacturing facility at El Segundo. Thereafter, the Presstite Division commenced to manufacture at El Segundo products which theretofore had been manufactured elsewhere, and the number of products so manufactured at El Segundo increased from time to time. The El Segundo operation did not work out as well and was not as profitable as the Presstite Division might have expected it to be, and it was unable to manufacture at El Segundo some products, significant to its business, which it had expected to manufacture there.

5. Plaintiff is a California corporation with its principal place of business in Los Angeles. All of its stock is owned by James H. Berry, who is the President of plaintiff. During part of the time relevant hereto, one-half of the stock of plaintiff was owned by Harold E. Staub. During all relevant times, commencing prior to 1960 and continuing to the present, plaintiff has conducted a successful business as a distributor of cement-asbestos board manufactured by Johns-Manville, and related products, and as a contractor specializing in the construction of walk-in refrigerator boxes.

6. Commencing about 1950, plaintiff's predecessor, Hubbard & Stau, later the Hubbard Company hereinafter referred to as "Hubbard") distributed Presstite products in the West. In due course it acquired exclusive distribution rights for such products in the industrial and construction markets in California, Arizona and Nevada. There was a series of written contracts and addenda thereto respecting such distribution. In 1961, except for three distributors to the trailer industry and a few other exceptions, Hubbard had by contract the exclusive right to distribute such Presstite products to such markets in such area. Hubbard's contract provided that it would not deal in products competitive to Presstite products without consent of the Presstite Division and that it would not sell Presstite products to certain classes of customers. Hubbard distributed several products of various kinds in addition to Presstite products.

7. In January 1961, plaintiff contracted to purchase the business and goodwill of Hubbard, subject to certain conditions, including the condition that plaintiff be satisfied that it could distribute Presstite products on the same basis as Hubbard had done. In late January or early February 1961, Messrs. Berry and Staub, then the principal officers and shareholders of plaintiff, went to St. Louis and met with the principal officers of the Presstite Division as well as with other Presstite personnel. Those officers orally promised Berry and Staub that if plaintiff purchased Hubbard, plaintiff could be the Presstite distributor in California, Arizona and Nevada on the same terms as Hubbard then enjoyed and would continue to be such as long as plaintiff did a good job. In reliance on this assurance, plaintiff completed the purchase of Hubbard and embarked on the business of distributing Presstite products and other products theretofore distributed by Hubbard, in addition to its other businesses. There was never a written contract or agreement between plaintiff and the Presstite Division confirming or defining the relationship between them.

8. At the time it was purchased by plaintiff, Hubbard maintained an office, warehouse, and sales force in Los Angeles, an office and salesman in San Francisco, and a salesman in San Diego. Hubbard also supplied Presstite products to subdistributors who resold the same to users in particular industries. For example, Hastings Plastics resold certain products to plastic fabricators and Jones Foundry Supply and Barker Foundry Supply resold Kopeseal to the foundry industry. Hubbard also supplied a Presstite product to Filon, a manufacturer of fiberglass reinforced plastic panels, under Filon's private label, which Filon redistributed with and for

use with its plastic panels. Of course, Hubbard also supplied Presstite products to a wide variety of manufacturers, building contractors and subcontractors, and other users of the products.

9. Following its acquisition of the Hubbard business of distributing Presstitle products and other products, plaintiff continued that business generally in the manner in which it had theretofore been conducted by Hubbard. In addition, plaintiff instituted some new policies by way of advertising and attempts to find new applications for Presstite products designed to expand the business. Of course, plaintiff held sales meetings to acquaint its salesmen primarily dealing in other products with the Presstite products, so that they could be alert to sales opportunities for Presstite products in connection with their other calls. Plaintiff was encouraged and complimented on its endeavors in this connection by Presstite personnel at many levels of responsibility and authority.

10. Shortly following plaintiff's acquisition of the Hubbard business, the Presstite Division commenced to sell to Hastings Plastics the Presstite products which Hastings had theretofore purchased from Hubbard at a price equal to or less than the price at which plaintiff purchased such goods from the Presstite Division. This, of course, deprived plaintiff of business on which it theretofore had enjoyed a mark-up.

11. At about the same time, the Presstite Division commenced to sell the Filon private label goods, which had theretofore been sold through Hubbard and, briefly, plaintiff, to Filon on a direct basis at the same price as that at which such goods had been purchased by plaintiff. This deprived plaintiff of business on which it theretofore had enjoyed a mark-up.

12. During this same period, Harry Lowry, Presstite's Western Sales Manager, prepared a survey of the West Coast distributor situation, recommending to the Presstite management that larger sales be handled on a direct basis and that only sales of $500 or less be handled through distributors.

13. In March of 1961, an agreement was made between the Presstite Division and Boething-Francis whereby Boething-Francis would distribute certain Presstite products to the trailer trade and would purchase the same at distributor prices.

14. In March of 1961, the Presstite Division commenced to sell a limited number of its products at distributor prices to Yates Products Company, a distributor of sealants, adhesives and other products to the trailer industry. Yates had purchased such Presstite products theretofore from Hubbard and plaintiff. Plaintiff was thereby deprived of some business on which it had theretofore enjoyed a mark-up.

15. In October of 1961, the Presstite Division made an agreement with Harold A. Price Company of Richmond, California, whereby Price could purchase a limited number of Presstite products at distributor prices for resale in Northern California. The number of such products handled by Price increased. By January of 1963, plaintiff's business in San Francisco had declined to the point that plaintiff closed its San Francisco office. Thereafter, the Presstite Division advised plaintiff that its territory was reduced to the portion of California southerly of Monterey, Kern and Mono counties.

16. During much, if not all, of the period referred to in the complaint, Elixir Paint & Lacquer Co. was able to purchase Presstite products, which it distributed to the trailer trade, from the Presstite Division at a price lower than the price at which such products were available to plaintiff.

17. Commencing about March of 1963, and continuing thereafter, the Presstite Division sold Kopeseal, a Presstite product, at distributor prices to Jones Foundry Supply and Barker Foundry Supply Co., both of whom had theretofore purchased their requirements of Kopeseal from plaintiff, for resale to the foundry trade. Plaintiff was thereby

deprived of some business on which it had theretofore enjoyed a mark-up. In July of 1963, the Presstite Division offered Jones a discount on Kopeseal for resale to Kaiser which was substantially greater than any discount which had ever been offered to plaintiff on that product.

18. From time to time, the Presstite Division sold Presstite products to other persons who had theretofore purchased their requirements for such Presstite from plaintiff, thereby depriving plaintiff of business on which it theretofore had enjoyed a mark-up.

19. George D. Kite had been employed by Hubbard as a salesman from 1952 until plaintiff purchased the Hubbard business. Thereafter plaintiff employed Kite as a salesman, and by September of 1963, Kite was plaintiff's most valued and principal salesman of Presstite products. In September of 1963, the Presstite Division determined to begin selling its products on a direct basis to essentially everyone in the Los Angeles area who cared to purchase them. In this connection, Presstite employees held the view that the Presstite Division could get 95% of plaintiff's business if the Presstite Division would hire Kite. The Presstite Division did hire Kite as a salesman, at a salary increase of more than 20%, and commenced direct selling. The Presstite Division did not advise plaintiff of its intentions prior to hiring Kite.

20. At the time of his employment by the Presstite Division, Kite had in his possession fairly complete records of plaintiff's customers for Presstite products and their respective requirements. Kite utilized those records in selling Presstite goods for the Presstite Division on a direct basis to persons who had been customers of plaintiff for such Presstite products, and since the price at which such goods could be obtained from the Presstite Division was lower than the price which plaintiff had been charging for such goods, most of such persons thereafter purchased their requirements of such products from the Presstite Division.

21. Throughout this period, until it hired Kite, the Presstite Division encouraged plaintiff to greater efforts, congratulated it on its successes, promised full cooperation, and denied any intention to injure plaintiff's business. Although the Presstite Division complained, from time to time, about small orders and other relatively insignificant matters, plaintiff had no warning that the Presstite Division was planning to sell its products to everyone on a direct basis until after Kite had been hired and it was about to commence to do so.

22. After the Presstite Division hired Kite and commenced selling its products on a direct basis to everyone in the Los Angeles area who cared to purchase them, plaintiff's business in Presstite products was drastically reduced. Plaintiff continues to purchase Presstite products from the Presstite Division at distributor prices and to resell them, but the volume of such business is insignificant when compared with the volume of such business which plaintiff enjoyed when it first purchased the Hubbard business.

The foregoing factual summary does not include matters which seem relevant only to Robinson-Patman Act claims. Such matters will be mentioned in connection with the discussion of such claims. Other more specific facts may be mentioned from time to time in connection with particular discussions.

## THE MERITS

The materials before the Court would not sustain a verdict for plaintiff, under section 4 of the Clayton Act, 15 U.S.C. § 15, for damages for injury to plaintiff's business or property by reason of anything forbidden by the antitrust laws on any theory which has been suggested to or which has occurred to the Court. The Court can find no combination, conspiracy or agreement unreasonably to restrain interstate commerce, no unlawful monopoly, no attempt to monopolize, no violations of the Robinson-Patman Act, in short, nothing forbidden by the antitrust laws. As will hereafter appear, plaintiff has pointed to a few

isolated instances of conduct which could, with more, constitute unlawful conduct, but (a) there is no indication that the additional matters necessary to a finding of unlawfulness exist, (b) such matters standing alone would not support an inference of unlawful conduct, and (c) there is nothing to indicate that plaintiff sustained any injury by reason of such matters, the nature of the matters being such that injury could not be presumed.

In these circumstances, plaintiff's "entire case" does not constitute a prima facie case against defendants, or either of them, and as a matter of law, plaintiff could not prevail against defendants. Defendants should have judgment forthwith.

A more detailed analysis follows:

### Monopoly

In its Supplemental Response, plaintiff stated its position thus (p. 2, lines 13–16):

"Defendants, both, monopolized the sale of Presstite products in the Southern California area when they, in succession, took over the business of plaintiff in such products, by predatory means."

In this connection, plaintiff referred to its argument with respect to attempt to monopolize, and in that argument plaintiff said:

"The attempts to monopolize resulted in a complete monopoly of plaintiff's business of selling Presstite products —when plaintiff was driven out of this business in September 1963." (Id. at p. 3, line 32 to p. 4, line 3)

The charge, then, is that the Presstite Division monopolized the sale of Presstite products in Southern California or that the Presstite Division monopolized the portion of the sale of Presstite products which might otherwise have been handled by plaintiff. No violation of section 2 of the Sherman Act is encompassed in those charges.

Of course, in a sense, the Presstite Division had a monopoly over Presstite products and all phases of their distribution. The Presstite Division manufactured the Presstite products and sold most of them under one or more trademarks it owned. It necessarily had the power to control the manufacture and sale of Presstite products and to exclude competition in the manufacture and sale of Presstite products. But the existence of that power is not illegal. The Supreme Court recognized this in United States v. E. I. Du Pont De Nemours & Co. (Cellophane), 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264, 1279 (1956):

"Thus one can theorize that we have monopolistic competition in every non-standardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly."

And other courts have uniformly held that the inherent power of a manufacturer over his own trademarked goods is not illegal monopoly power, particularly when such goods are in competition with other goods,:

"The trade-mark laws, like the patent laws, give the owner a monopoly which neither the Sherman Act nor any other act of Congress forbids. It would be a paradox to say that the exercise of a right, expressly granted by law is unlawful." Coca-Cola Co. v. J. G. Butler & Sons, 229 F. 224, 232 (E.D. Ark.1916).

"Where commodities are competitive and reasonably interchangeable, the relevant market cannot be confined to the products of one manufacturer." South End Oil Co. v. Texaco, Inc., 237 F.Supp. 650, 656 (N.D.Ill.1965). "It has long been recognized that a manufacturer has a right to a monopoly in the sale and distribution of its own product." A–1 Business Mach. Co. v. Underwood Corp., 216 F.Supp. 36, 37 (E.D.Pa.1963).

"Every manufacturer has naturally a complete monopoly of his particular product especially when sold under his

own private brands, and no private controversy with a distributor could legally tend to increase that type of a natural monopoly. The Sherman Act is, therefore, clearly not really involved." Arthur v. Kraft-Phenix Cheese Corp., 26 F.Supp. 824, 828 (D.Md.1938).

"Every manufacturer has a natural and complete monopoly of his particular product, especially when sold under his own private brand or trade name. * * * If he is engaged in a private business, he is free to exploit this monopoly by selling his product directly to the ultimate consumer or through one or more distributors or dealers, as he may deem most profitable to him. If he chooses the latter method, he may exercise his own independent discretion as to the parties with whom he will deal. This is a common law right which the anti-trust laws have not destroyed." Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899, 902 (D.Md.1956), aff'd per curiam, 239 F.2d 176 (4th Cir. 1956); cert. denied, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957).

To the same general effect, Walker Distrib. Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 9 (9th Cir. 1963); Ace Beer Distribs., Inc. v. Kohn, Inc., 318 F.2d 283, 286–287 (6th Cir. 1963) cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); Nelligan v. Ford Motor Co., 262 F.2d 556, 557 (4th Cir. 1959); Kemwell Auto. Corp. v. Ford Motor Co., 1966 Trade Cas. ¶ 71,882, at 83,096 (S.D.N.Y. 1966); Moutoux v. Gulling Auto Elec., Inc., 1963 Trade Cas. ¶ 70,639, at 77,606 (S.D.Ind.1962).

■ Clearly the existence in the Presstite Division of monopoly power over the manufacture, distribution and sale of its own products is not unlawful, and any claims based simply on the existence of that power must fail.

Plaintiff charges, however, not merely that the power existed but that it was ruthlessly exercised to destroy plaintiff's business by creating a new distributor to compete with plaintiff, by by-passing plaintiff and dealing on a direct basis with some of plaintiff's better customers, and eventually by hiring plaintiff's star salesman and stealing the bulk of plaintiff's business, all the while utilizing "discriminatory" pricing policies in aid of such destruction and, all in violation of plaintiff's contractual right to be the exclusive distributor of Presstite products in its territory as long as it did a good job. But the exercise by the Presstite Division of its lawful monopoly power in the manner charged does not make its lawful monopoly over its own products unlawful.

■ The Presstite Division at any time could have terminated plaintiff's distributorship of Presstite products, appointed a new distributor and refused to deal further with plaintiff, without making its natural monopoly of its own products illegal or otherwise violating the antitrust laws. Such was held to be lawful with respect to other manufacturers, distributors and products in each of the following cases in which a monopoly charge was made: Walker Distrib. Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 8–9 (9th Cir. 1963); Ace Beer Distribs., Inc. v. Kohn, Inc., 318 F.2d 283, 286–287 (6th Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); Moutoux v. Gulling Auto Elec., Inc., 1963 Trade Cas. ¶ 70,639 (S.D.Ind.1962); Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899, 903 (D.Md.1956), aff'd per curiam, 239 F.2d 176 (4th Cir. 1956), cert. denied, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957). Or the Presstite Division could have terminated plaintiff's distributorship of Presstite products, refused to deal further with it and thereafter dealt exclusively with some other existing distributor. Packard Motor Car Co. v. Webster Motor Car Co., 243 F.2d 418, 420–421 (D.C.Cir. 1957), cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); South End Oil Co. v. Texaco, Inc., 237 F.Supp. 650, 654 (N.D.Ill.1965). The net of this necessarily is that, as

far as the antitrust laws are concerned, the Presstite Division was free at any time to alter its distribution system in any manner satisfactory to it without thereby rendering its natural lawful monopoly over its own products unlawful.

■ An improper or unfortunate motive will not convert an act which is otherwise lawful under the antitrust laws into an act prohibited by the antitrust laws. The following cases provide examples of this: Hunt v. Crumboch, 325 U.S. 821, 824–825, 65 S.Ct. 1545, 1547, 89 L.Ed. 1954, 1956–1957 (1945), where the motive was to destroy plaintiff's business in retaliation for the death of a union man during a strike—plaintiff having been acquitted of the killing; Ace Beer Distribs., Inc. v. Kohn, Inc., 318 F.2d 283, 286 (6th Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267 (1963), where the motive was maliciously to destroy plaintiff's business; Arthur v. Kraft-Phenix Cheese Corp., 26 F.Supp. 824, 829 (D.Md.1938), where the motive apparently was to collect a shakey debt.

■ Similarly, an act which may lawfully be done under the antitrust laws is not made unlawful under the antitrust laws by being performed in a reprehensible manner or in a manner which violates laws other than the antitrust laws. In Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), involving "a lawless invasion of petitioner's plant and destruction of its property by force and violence of the most brutal and wanton character," the Supreme Court said:

> "Restraints not within the [Sherman] Act, when achieved by peaceful means, are not brought within its sweep merely because, without other differences, they are attended by violence." 310 U.S. at 513, 60 S.Ct. at 1002–1003, 84 L.Ed.2d at 1334.

To the same effect in differing factual settings, see: Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 139–140, 81 S.Ct. 523, 530–531, 5 L.Ed.2d 464, 472 (1961), involving unethical tactics in attempting to influence legislation detrimental to the trucking industry; Walker Distrib. Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 5, n. 1 (9th Cir. 1963), involving a conspiracy between a manufacturer and an individual to get plaintiff's distributorship of the manufacturer's product for the individual; Ace Beer Distribs., Inc. v. Kohn, Inc., 318 F.2d 283, 286 (6th Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267 (1963), involving destruction of plaintiff's business by conspiracy to terminate its distributorship and by hiring away most of its employees, causing them to quit suddenly without notice; Parmelee Transp. Co. v. Keeshin, 292 F.2d 794, 804 (7th Cir. 1961), cert. denied, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed. 2d 340 (1961), involving obtaining a lawful transportation monopoly and the destruction of plaintiff's business, through the corruption of, and abuse of office by, a public official; A–1 Business Mach. Co. v. Underwood Corp., 216 F.Supp. 36, 37 (E.D.Pa.1963), involving "reprehensible" interference with plaintiff's business relationships in the protection of defendant's monopoly of its own product.

■ Therefore, accepting plaintiff's characterizations of the conduct and motives of the Presstite Division, and assuming such conduct and motives to be morally wrong or legally wrong by some law óther than the antitrust laws, still, so far as section 2 of the Sherman Act is concerned, the Presstite Division has done no more than to exercise its lawful rights with respect to its own product, and it has done nothing proscribed by that section.

> "[The Sherman] Act does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." Hunt v. Crumboch, 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954, 1957 (1945).

> "[T]he use of conventional antitrust language * * * will not extend the reach of the Sherman Act to wrongs not germane to that act, even

though such wrongs be actionable under state law. * * * The antitrust laws were never meant to be a panacea for all wrongs." Parmelee Transp. Co. v. Keeshin, 292 F.2d 794, 804 (7th Cir. 1961), cert. denied, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961).

After being advised at the hearing on May 22, 1967 that the Court could not find anything unlawful about the "monopoly" the Presstite Division had over its own products, plaintiff commenced its OTDE with the following statement:

"Plaintiff claims that defendants in their ownership and operation of the Presstite Division had monopoly power; that is, the power to control prices and exclude competition. Plaintiff also claims that the oral testimony and documentary evidence demonstrate that defendants (in Presstite) possessed the specific intent to exercise such power, or to acquire and exercise such power, with respect to a part of commerce—to the injury and damage to plaintiff's business and property."

The opening statement is followed by seven pages of deposition testimony by Harry Lowry in which he identifies a document entitled "Available Products Manufactured by Competitors Which Are Functionally Equivalent to Presstite Products", testifies that he does not know who made it or how it was prepared, testifies that it is inaccurate in including as competitive products which are not and in failing to include substantial competitors, and finally testifies that "no group of companies as high as the 70 listed here could supply an exact duplication of the [Presstite] materials." Lowry's testimony also indicated that there was plenty of competition for Presstite materials on the basis of functional equivalence, and the document "Available Products [etc.]", although the copy furnished to the Court was substantially illegible, indicates (a) that, accepting Lowry's count, Presstite has 70 or more competititors for various products, (b) that Presstite has at least one competitor for every product and up to 22 competitors for some (1175 and 1176), (c) that, if the abbreviations refer to companies commonly known by similar names, Presstite's competitors are not insubstantial companies—3M competes in 47 categories of products, and other competitors include Flintkote, Johns-Manville, Standard Oil, Sun Oil, Armstrong Cork, PPG, U. S. Rubber, General Tire, B. F. Goodrich, Dow, and others, (d) that some competitors obviously have a broad line of products and compete on a functional basis with Presstite over a broad spectrum of products—3M, Tremco, Thiem, Arenco, Mortell, Chemical Sealants, DAP, Daubert, and (e) that there are many competitors on the popular items (1175, 1176, 1190, 582, 579, 576, 570, 427, 163, 162—in each case with variant suffixes—and others). There is no indication, in the OTDE or in any of the rest of plaintiff's submission, of Presstite's market position as to any one or more or all of the products. There is nothing anywhere in plaintiff's presentation to show what the "relevant market" might be, whether with respect to "sealants" generally, or particular kinds of sealants, or sealants for particular uses, or whatever. There simply is no evidentiary support for the proposition that the Presstite Division had a monopoly of anything other than Presstite products, such proof as there is being to the effect that the Presstite Division does *not* have a monopoly position with respect to sealants generally, or with respect to any particular kind or kinds of sealants, or with respect to anything at all other than its own products.

At page 8, lines 19–21, of the OTDE, plaintiff quotes from United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956), (hereinafter referred to as *Cellophane*) that " 'If cellophane is the "market" that DuPont is found to dominate, it may be assumed it does have monopoly power over

that "market".'" From that, plaintiff concludes, at lines 22–25, that "Likewise, if sealants are the market and the Presstite Division dominates that market, it may be assumed that defendants have monopoly power over that market." Principal difficulty with such reasoning is that there is no proof at all of either of the factors in the "if" clause, i. e., no proof that "sealants are the market" and no proof that "Presstite dominates that market." In *Cellophane*, the quoted statement was preceded by the recital that the proof showed that Du-Pont produced 75% of the cellophane sold in the United States, that Sylvania produced *all* the rest, and that DuPont controlled access to the technique without which commercial manufacture of cellophane was impossible, all of which indicates a different situation from that presented here.

At lines 7–13 on page 9 of the OTDE, plaintiff argues:

"Since defendants in the Presstite Division have a line of products in the sealant market that can be matched only through a combination of products of 30 to 50 different manufacturers, it cannot be questioned that they also have the requisite monopoly power to *control prices* or *exclude competition* in the sealant market. At least, there is sufficient evidence in the showing made upon which a jury can make such a finding."

That reasoning is completely specious. Market dominance with respect to controlling prices and competition simply is not a correlative of number of products or competitors it would take to duplicate the line. The fact that no one has chosen to compete with the Presstite Division as to *all* its products proves nothing at all with respect to the market position or power of the Presstite Division as to sealants generally or as to any particular category of sealants.

■ The next segment of the OTDE, pages 9–18, quotes at length from a survey of Presstite distributors in the West Coast Market made by Lowry and ends with the claim that the survey establishes Presstite's power to exclude competition and control prices by selling to plaintiff's customers on a direct basis at prices established by Presstite. However, there is nothing unlawful in the fact that Pressite had power to sell its goods to whomever it chose and to do so at prices satisfactory to it. Lowry's survey was simply a review of the situation then existing and a series of recommendations for revisions in the distribution policy of the Presstite Division to meet the necessities of competition, and as other evidence quoted by plaintiff at page 18 shows, his suggestions were not accepted by the Presstite Division management.

Under the available proof, the only "monopoly" power which the Presstite Division has or had was with respect to its own products, manufactured by it and, for the most part, sold under its trademarks. Plaintiff's statement of its claims in broader terms in the OTDE cannot obscure that fact. As indicated above, having such power over its own products does not violate the antitrusts laws and cannot provide a source for a claim in plaintiff.

The motion to eliminate issues is granted as to issues numbered 4 and 5, i. e., any claim that Martin-Marietta or Interchemical monopolized any part of interstate trade and commerce in sealing compounds or other products.

### Attempt to Monopolize

■ In its Supplemental Response, plaintiff set forth its position with respect to attempts to monopolize by referring generally to the Presstite Division's "campaign to eliminate plaintiff as a distributor of such [Presstite] products and to take over such business of plaintiff" (p. 3, lines 17–19), to the hiring by the Presstite Division of George Kite and the establishment of Presstite's own direct selling organization, and to portions of its Narrative for details respecting the loss of its customers. It concludes by stating that

"The attempts to monopolize resulted in a complete monopoly of plaintiff's business of selling Presstite products—when plaintiff was driven out of this business in 1963." (p. 3, line 32 to p. 4, line 3). Plaintiff says nothing about attempts to monopolize in its OTDE.

There is no suggestion that the Presstite Division attempted to monopolize trade and commerce in sealing compounds or related products generally, or that the Presstite Division attempted to monopolize or exert any power at all over anything other than Presstite products, and the Court finds no evidence of such attempt in its own review of the materials before it. Plaintiff admits and the evidence clearly demonstrates that Presstite products are in competition with other sealing compounds and related products. The claim is simply that the Presstite Division *attempted* to monopolize the sale of its own Presstite products.

As noted above, the Presstite Division always had a "monopoly" of sorts in the manufacture, distribution and sale of Presstite products. That is the natural result of the fact that it manufactures the products and sells most of them under its own trademarks. It is also entirely legal. It would be simply absurd to find a violation of the antitrust laws by characterizing Presstite's conduct as an *attempt* to obtain the lawful monopoly it always had.

"It cannot be conceived that assertions of attempts by defendant to monopolize the export sales of its own products would improve plaintiff's legal position one whit." Kemwell Auto. Corp. v. Ford Motor Co., 1966 Trade Cas. ¶ 71,882, at 83,096 (S.D.N.Y. 1966).

The motion to eliminate issues is granted as to issues numbered 6 and 7, i. e., any claim that Martin-Marietta or Interchemical attempted to monopolize any part of interstate trade and commerce in sealing compounds or other products.

### Contract, Combination or Conspiracy to Restrain Trade

Defendants' motion to eliminate issues framed at least 14 issues which described in various ways claims of contract, combination or conspiracy which defendants thought plaintiff might be trying to assert. Plaintiff stated it made every one of such claims, but it did not make complete specifications of its position with respect to any of them, and it refused to present its case for analysis on the basis of those issues. Eliminating purported statements of the law, the following is the totality of plaintiff's statements with respect to contracts, combination or conspiracies in restraint of trade:

"[The Presstite Division] combined, conspired, agreed or reached an understanding with such persons (and corporations) as George D. Kite, Filon Plastics, Hastings Plastics, Elixir Paint and Lacquer, Jones Foundry, Yates and others, the effect of which was to attempt to exclude or excluded plaintiff as a competitor in the sale of Presstite materials. See * * * Narrative, pages 38–48." [which purports to describe the dealings between Presstite and the named persons and other persons who had been customers of plaintiff] (Supplemental Response, p. 5, lines 25–32, directed to Issue 8 respecting claims of conspiracy to monopolize.)

"The same facts which support plaintiff's claim of attempted monopolization and combination or conspiracy to monopolize support plaintiff's claim of unreasonable restraint in violation of Section 1 of the Sherman Act. See plaintiff's statement in connection with Issues 6 and 8." (Supplemental Response, p. 7, lines 5–10, directed to Issue 12 respecting claims of conspiracy unreasonably to retrain trade.)

"Soon after plaintiff had purchased the Hubbard Company (and with the purchase, all rights enjoyed by Hubbard as an exclusive distributor of Presstite sealants, sealing compounds or other products) [the Presstite Di-

vision] began its campaign to eliminate plaintiff as a distributor of such products and to take over such business of plaintiff. See * * * Narrative, pages 19–22; pages 34–38. It continued this predatory conduct (while giving lip service to a pretense that it meant to continue to do business on the best terms with Industrial Building Materials) until September 1963 when it firmly established its own 'direct selling organization'—after hiring George Kite away from plaintiff to head up the selling efforts in this 'direct selling organization'. See * * Narrative, pages 38–57. * * * The attempts to monopolize resulted in a complete monopoly of plaintiff's business of selling Presstite products—when plaintiff was driven out of this business in September 1963." [Portions segregating defendants omitted.] (Supplemental Response, p. 3, line 14 to p. 4, line 3, directed to Issue 6 respecting claims of attempt to monopolize.)

"Plaintiff claims that Interchemical contracted, combined and conspired with George Kite in violation of both sections 1 and 2 of the Sherman Act." [General cross-reference omitted.] (Supplemental Response, p. 9, lines 19–22, directed to Issue 20 respecting claims of conspiracy with George Kite.)

"Most if not all of the persons listed in this issue [25, which named everyone to whom the Presstite Division sold anything and to which plaintiff referred in its Narrative or Appendices thereto] * * * were sold Presstite products at prices which discriminated against plaintiff. Appendix A shows the prices and discounts for Presstite products to the persons listed. * * * The prices and discounts to the persons listed discriminate against plaintiff. Most of the persons listed were customers of plaintiff persuaded by [the Presstite Division] to purchase from [it] rather than plaintiff through the discriminatory prices offered to such customers. Plaintiff

claims that the discriminatory prices utilized by [the Presstite Division] in winning away the business of Plaintiff's customers were part of [the Presstite Division's] violation of both Sections 1 and 2 of the Sherman Act." (Supplemental Response, p. 10, line 29—p. 11, line 8, directed to Issue 25 respecting claims of Robinson-Patman Act violations, but incorporated by reference with respect to Issue 28 respecting claims of illegal contracts or agreements with the named purchasers of Presstite products.)

Plaintiff's claims of contract, combination and conspiracy are at best amorphous, but several things appear from plaintiff's statements with considerable clarity:

(a) The claimed contracts, combinations or conspiracies relate solely to Presstite products, and there is no claim that any contract, combination or conspiracy was directed at or in any way restrained or affected trade in sealing products generally or in anything other than Presstite products.

(b) Even as to Presstite products, there is no claim that any contract, combination or conspiracy had any purpose or effect other than the destruction of plaintiff's business as a distributor of Presstite products and the elimination of the competition of plaintiff in the sale of Presstite products, and there is no claim of horizontal or vertical price-fixing agreements.

Although plaintiff's claim could be construed as asserting a single combination, conspiracy, agreement or understanding among Presstite, George Kite, Filon, Hastings, Elixir, Jones, Yates and others (see the response to Issue 8 quoted above), it is apparent that there was no single agreement or understanding to which all of the named persons, much less anyone else, were privy, and there is not one shred of evidence which even hints at the existence of any such agreement or understanding. Obviously, what plaintiff means to charge is that Presstite made a series of separate agreements or understandings with each of such per-

sons and perhaps others separately, the effect of which, separately or in the aggregate, was to exclude plaintiff as a competitor in the sale of Presstite products.

■■ As has been indicated previously, the Sherman Act does not apply to the exercise by a manufacturer of its power to control the sale of its products. The manufacturer may eliminate existing distributors, establish new ones, or otherwise vary its distribution program without violating the antitrust laws, even though particular dealers or distributors may be injured thereby, and even though the manufacturer's conduct might be considered immoral, reprehensible or unlawful by other than antitrust standards, so long as such power is not being exercised as part of or in aid of something else which is prohibited by the antitrust laws.

The following cases specifically held that the changing of distribution policy by a manufacturer pursuant to agreement with a competitor of the distributor affected by the change or with a successor to the distributor affected by the change was not prohibited by the Sherman Act where the agreement related only to the means of distribution of the manufacturer's product: Walker Distrib. Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 5, n. 1 (9th Cir. 1963), involving an agreement with plaintiff's successor to get plaintiff's distributorship for the successor; Ace Beer Distribs., Inc. v. Kohn Inc., 318 F.2d 283, 287 (6th Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), involving a "conspiracy" to destroy plaintiff's distribution business and establish co-conspirators as successors to that business; Packard Motor Car Co. v. Webster Motor Car Co., 243 F.2d 418, 420 (D.C.Cir. 1957), cert. denied, 355 U.S. 822, 78 S.Ct. 29 (1957), involving an agreement with a competitor of plaintiff to make its dealership exclusive and eliminate two other competing dealers, including plaintiff; Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899, 906–907 (D.Md.1956), aff'd per curiam,

239 F.2d 176 (4th Cir. 1956), cert. denied, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957) involving an agreement with a competitor of plaintiff to make its dealership exclusive and eliminate two other competing dealers, including plaintiff.

■ Similarly, as the following discussion demonstrates, each of the contracts, agreements, understandings or combinations to which plaintiff refers was no more than a contract, agreement or understanding between the Presstite Division and another party that the Presstite Division would sell its goods to that party, as a distributor or otherwise, either instead of selling such goods to plaintiff or while continuing to sell or to offer to sell such goods to plaintiff, so none of such contracts, agreements, understandings or combinations violated the Sherman Act.

*Filon Plastics.* Filon Plastics was a manufacturer of fiberglass-reinforced plastic panels. For some years it had distributed Presstite product 439 in 20 foot and 80 foot rolls under Filon's private label and in a special package for use with Filon's panels. Until June of 1961, Filon purchased its requirements of that product from Hubbard and plaintiff. In June of 1961, the Presstite Division commenced to sell the product to Filon on a direct basis at the distributor price, i. e., the same price at which the same goods were available to plaintiff. Plaintiff asserts that the Presstite Division's prices to Filon were "discriminatory", but the invoices cited by plaintiff show that Filon and plaintiff paid the same price for the same goods. Plaintiff cites the deposition testimony of plaintiff's president, Mr. Berry, that the Filon purchasing agent told him he purchased from the Presstite Division because it gave him a lower price than plaintiff, and that Lowry said he sold direct to Filon because if he didn't sell to Filon somebody else would. Plaintiff's Document No. 66 is an internal Presstite memorandum in which Lowry reports that the sale to Filon was made to meet a lower price for a similar prod-

uct offered by Dicks-Armstrong-Pontius, a competitive manufacturer of sealing products. That is the complete evidence which has been proffered with respect to Filon. The most that it suggests in the way of a contract or agreement between Filon and the Presstite Division is simply an agreement to purchase and sell goods. Although the sale was obviously to be on a direct basis, rather than through plaintiff, there is no suggestion of a condition that Filon not deal further with plaintiff. There is absolutely no evidence of, or anything to support an inference of, any agreement, understanding, concert of action, or anything else which was in restraint of trade.

*Hastings Plastics.* Hastings was a distributor of materials and supplies, including two Presstite products, 579.6 and 582, to the plastics fabricating industry. It had purchased those Presstite products from Hubbard and from plaintiff. Commencing in June of 1961, the Presstite Division supplied Hastings' requirements for Presstite 579.6 and 582 on a direct basis. Plaintiff states that Lowry explained the direct sales to Hastings on the ground that Mr. Hastings told him that if he didn't sell direct somebody else would. Plaintiff characterizes Lowry's reason as "hollow and transparent". (Narrative, p. 41, lines 23–26). On the other hand, Lowry reported to his superiors that Hastings "is a specialized type of distributor servicing Plastics & Aircraft industry" (Plaintiff's Doc. No. 184). Lowry also reported that the reason for appointing Hastings a distributor was that plaintiff's mark-up on the goods it sold to Hastings was such that "we were priced out of the market" (Ibid.) and the direct distributorship would allow Hastings "a better competitive position to the present set-up of brokering this business through the I.B.M. (Hubbard Co. and somewhat curtailing our sales in this field." (Plaintiff's Doc. No. 181). Apparently, Hastings enjoyed lower prices than I.B.M. from time to time on product 579.6. There is no evidence at all with respect to or which would support

an inference of any agreement, understanding, contract or the like between Hastings and Presstite except with respect to the purchase by Hastings of Presstite goods and the price to be paid, and nothing at all in restraint of trade.

*Elixir Paint & Lacquer Co.* Elixir distributed a number of products to manufacturers of trailers or mobile homes, including Presstite products 576.1 and 162. In its Narrative at p. 42 plaintiff quotes some speculation by Mr. Berry on deposition that Elixir was purchasing goods from Presstite at a lower price than plaintiff. While Elixir probably enjoyed a lower price than plaintiff from time to time on some Presstite items, plaintiff points to nothing at all in its Narrative with respect to the existence of any agreement, understanding, contract or the like, other than simply for the sale of goods, between Presstite and Elixir, much less anything which would show any restraint of trade. The documents which plaintiff cited in its Narrative's Appendix C relating to Elixir are similarly devoid of any suggestion of restraint of trade.

*Jones Foundry Supply.* Jones was a distributor of foundry supplies of various kinds, including Presstite's Kopeseal product No. 975. Jones had purchased its requirements of Kopeseal through Hubbard and then through plaintiff. Commencing in March of 1963, the Presstite Division supplied Jones' requirements of Kopeseal on a direct basis, rather than through plaintiff. Plaintiff's evidence shows no contract, agreement, understanding, concert of action, etc. other than the agreement for the purchase and sale of goods, and nothing at all in restraint of trade.

*Yates Products.* Yates was a distributor of a number of materials and supplies to trailer manufacturers and others. Plaintiff's entire statement and evidence as to Yates is that Yates purchased some Presstite products from plaintiff and later the Presstite Division supplied its products to Yates on a direct basis at lower prices. There is nothing at all which even suggests the existence of any

contract or agreement other than one simply for the sale of goods.

*Other Customers.* At pages 43–44 of its Narrative, plaintiff complains that the Presstite Division sold its goods to other customers of plaintiff on a direct basis, but it describes no agreement and implies none, other than one simply for the sale of goods. In its Supplemental Response, plaintiff indicates that the Presstite Division "persuaded" those customers to purchase from it rather than plaintiff and used "discriminatory prices" in "winning away" that business. (p. 11, lines 2–7). This is not even consistent with plaintiff's theory of a conspiracy, contract, agreement, etc. between Presstite and such customers in restraint of trade, and it certainly neither suggests nor proves it.

*Harold A. Price Company.* Plaintiff charged in its Narrative that the Presstite Division "set up a distributorship in San Francisco [Harold A. Price Company] to compete with plaintiff and, in that connection, sold Presstite products to the distributor setup at prices lower than the prices charged to plaintiff, or at prices lower than those at which such 'distributor' had previously paid as a 'customer' of plaintiff. As a result of [Presstite's] conduct, plaintiff was forced to discontinue operating in San Francisco in the latter part of 1962." (Narrative, p. 20, lines 4–11.) The documents which plaintiff specified relating to Price indicate that in July of 1961, plaintiff fired Curly Burgan, who had been Hubbard's San Francisco salesman for many years, and Burgan went to work for Price, who had been distributing a limited number of Presstite products in the San Francisco area. (Plaintiff's Doc. No. 207). In October of 1961, the number of Presstite products which Price was authorized to distribute was increased, and an agreement with respect to such distribution was made between Price and the Presstite Division. Plaintiff's Docs. Nos. 220–21). The Presstite Division tried to get Price to leave plaintiff's customers alone (Plaintiff's Docs. Nos. 232, 233, and 238), but to no avail

(Plaintiff's Docs. Nos. 233, 236, and 239). Plaintiff elected to close its San Francisco office (Plaintiff's Docs. Nos. 21, 119, 123, and 124), and the Presstite Division expanded Price's distributorship to the full Presstite line for industrial and construction uses (Plaintiff's Doc. No. 249). The only thing in any way connected with a contract to retrain trade is that the Presstite Division attempted to get Price to agree not to compete with plaintiff. But it is obvious that no such agreement was made, that Price did compete with plaintiff by using products of competing manufacturers where Presstite products were not available to it, and that apparently Price competed so effectively that plaintiff elected to abandon its San Francisco operation. Plaintiff's complaint here is that the Presstite Division created competition for plaintiff in selling Presstite goods in San Francisco by appointing Price as a distributor, and the Presstite Division did *not* restrain Price from competing with plaintiff. That could hardly be a violation of the Sherman Act.

■■■ *George Kite.* When Presstite elected in September of 1963 to sell its products on a direct basis in the Los Angeles area essentially to anyone who cared to purchase them, it hired George Kite, plaintiff's star salesman of sealing products. Kite was familiar with plaintiff's business, and he had copies of certain of plaintiff's records which identified the persons who had been purchasing Presstite products from plaintiff and showed their respective needs. There is no direct evidence that any agreement was made whereby Kite would bring such records to his new employment or make use of them. Presstite employees expected that, by hiring Kite, the Presstite Division would be able to fill on a direct basis the sealing product requirements of most of the persons who had theretofore purchased such products from plaintiff, and this expectation apparently was confirmed by actual experience. Kite called on or otherwise contacted many or most, if not all, of the persons he had served

as a salesman for plaintiff and attempted to sell them Presstite goods for Presstite. The result was that Kite was very successful in selling Presstite products for Presstite to persons to whom he had sold Presstite products for plaintiff. Kite's selling was undoubtedly simplified by the fact that Presstite's list price was consistently lower than plaintiff's list price for the same Presstite goods. The conduct of the Presstite Division and Kite in this connection was not praiseworthy and was below ordinarily accepted standards of business ethics, and, depending on one's personal predilections, the conduct might properly be characterized as reprehensible, or as predatory, or as unfair competition, or as plain stupidity. Nevertheless, nothing smacks of restraint of trade within the ambit of the prohibitions of the Sherman Act. Presstite simply changed its distribution policy, which it had the right to do, and the Sherman Act does not apply to the means selected for that change. See the cases cited, supra, in connection with the discussion of plaintiff's claims of monopoly and the rights of a manufacturer with respect to the distribution of its products, and particularly Ace Beer Distribs., Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963), cert. denied 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), where plaintiff's distributorship had been terminated and its business had been stolen under even more reprehensible circumstances than those involved here, even accepting all of plaintiff's characterizations thereof, but the court found that the Sherman Act was not violated. The most that can be inferred from plaintiff's showing by way of an agreement between the Presstite Division and anyone is (a) that the Presstite Division agreed, from time to time, to sell its goods to various buyers, some of whom had theretofore purchased such goods from plaintiff and some of whom thereafter competed with plaintiff in the sale of Presstite products, and (b) that the Presstite Division agreed to employ George Kite and did so for the purpose of diverting plaintiff's customers to it on a direct basis. None of this violates any part of the Sherman Act.

Even after being advised at the hearing on May 22, 1967 that the Court could find nothing in the materials before it which would support any inference of unlawful conspiracy, contract, agreement or combination, plaintiff did not address itself to that theory of liability at all in its OTDE. It furnished some extracts from deposition testimony relating to dealings between the Presstite Division anl some of the entities discussed above, but it pointed to nothing to show any agreement other than for the purchase and sale of goods or employment, in the case of Kite.

The materials before the Court would not sustain any inference of unlawful contract, combination or conspiracy in restraint of trade or to monopolize. The motion to eliminate issues is granted as to all claims based on such a theory, viz., issues numbered 8, 9, 12, 13, 14, 15, 16, 17, 20, 21, 22, and 28. Similarly, the materials before the Court would not sustain any inference that the conduct of the Presstite Division in selling goods to any of the entities mentioned by plaintiff or any other customers of plaintiff, the hiring of George Kite, and the direct assault on plaintiff's business was prohibited by either section 1 or section 2 of the Sherman Act. The motion to eliminate issues is granted as to all such claims, viz., issues numbered 18, 19, 23, 24, 26, and 27.

### New Matter in the OTDE

The discussion heretofore has been directed to issues raised directly by the Motion to Eliminate Issues and the positions which plaintiff took in its Narrative and its Preliminary Response and Supplemental Response. Where appropriate, the material in the OTDE was recognized, considered and discussed. There were, however, three sections of the ODTE in which plaintiff seemed to be presenting for the first time new theories to sustain its claim for treble damages caused by violations of the Sherman Act. These were entitled "U. S. v. Arnold, Schwinn & Co.," "Resale

Price Maintenance", and "Control of Prices". A discussion of each of them follows.

■ *The Schwinn Case.* In its OTDE at pp. 20–31, plaintiff cites and quotes deposition testimony and documents which would support the inference that the Presstite Division unilaterally prescribed distributors' territories, excluded certain customers and classes of customers from the persons to whom its distributors were authorized to resell, and required Hubbard to refrain from dealing in competing goods without its consent, although there is no indication or claim that this last was ever imposed on plaintiff or that any attempt was made to do so. Plaintiff argues that each of such restrictions constituted a *per se* violation of the Sherman Act under the teachings of United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed. 2d 1249 (1967). Without stopping to analyze either the *Schwinn* case or its application to this particular conduct, but assuming that plaintiff is correct that such conduct would be unlawful under the *Schwinn* doctrine, plaintiff still does not show a prima facie case for relief. There is nothing to indicate that such restraints caused any injury to plaintiff, and the restraints are not such that the court could assume the existence of injury. Plaintiff's claims of injury are based entirely on business lost when former customers turned to a competing distributor, Harold A. Price Company, or to defendants for their needs. No other claim or showing with respect to injury is made. There is no claim or showing that the taking of customers was in any way connected with or in aid of the conduct claimed to be unlawful. Plaintiff cannot succeed by showing simply that defendants violated the antitrust laws and that it was injured by some other conduct unconnected with such vio-

lation. Plaintiff can succeed only by showing that its injury was by reason of the conduct prohibited by the antitrust laws. Winckler & Smith Citrus Prods. Co. v. Sunkist Growers, Inc., 346 F.2d 1012, 1014 (9th Cir. 1965); E. V. Prentice Mach. Co. v. Associated Plywood Mills, 252 F.2d 473, 477 (9th Cir. 1958); Hunter Douglas Corp. v. Lando Prods., Inc., 235 F.2d 631, 637–638 (9th Cir. 1956); Wolfe v. National Lead Co., 225 F.2d 427, 432–433 (9th Cir. 1955); Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358, 362 (9th Cir. 1955); Myers v. Shell Oil Co., 96 F.Supp. 670, 674–675 (S.D. Cal.1951); Lyons v. Westinghouse Elec. Corp., 235 F.Supp. 526, 538–539 (S.D. N.Y.1964); Arzee Supply Corp. of Conn. v. Ruberoid Co., 222 F.Supp. 237, 243 (D.Conn.1963) (dictum); Hutchinson v. American Oil Co., 221 F.Supp. 728, 731–732 (E.D.Pa.1963); Molinas v. National Basketball Ass'n., 190 F.Supp. 241, 243 (S.D.N.Y.1961); Wolfe v. National Lead Co., 15 F.R.D. 61, 63 (N.D.Cal.1953). Plaintiff has utterly failed to show any connection at all between the allegedly unlawful conduct and its claimed injury. Further, there is nothing about any of this in the Complaint or the Amended Complaint. Defendants correctly point out that to permit the assertion of such claims would be a variance and that, since all of the conduct occurred more than four years ago, any such claims would be barred by limitations. 15 U.S. C. § 15b.[5]

■ *Resale Price Maintenance.* The section of plaintiff's OTDE at pages 32 through 60 is entitled "Resale Price Maintenance". Except for a six page irrelevant digression into the circumstances surrounding the granting of a distributorship to Harold A. Price Company in San Francisco, this section seems to establish (a) that the Presstite Division issued price lists indicating prices it would charge on direct sales, which it suggested distributors follow on resales,

---

5. 15 U.S.C. § 15b

"Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this section and sections 15a and 16 of this title shall be revived by said sections."

and which, with discounts established by "quotations", established the price charged by the Presstite Division to the distributor; (b) that the distributor was at all times free to set any resale price he chose, but the Presstite Division reserved the right to take business on a direct basis if a distributor would not or could not make a price low enough to keep the business for Presstite products through the distributor and the business would otherwise be lost to competing goods; and (c) that various Presstite personnel thought plaintiff's prices were too high for plaintiff to obtain and keep business, and told Mr. Berry so. Neither the foregoing nor the specific occurrences to which the cited testimony and documents related indicates unlawful resale price maintenance. In short, no unlawful conduct is shown. Further, of course, there is nothing to indicate that any of the matters mentioned in this section of the OTDE injured plaintiff or that the things which did injure plaintiff were in any way connected with these matters. Nothing in this part of the OTDE, considered alone or with everything else, would support a claim by plaintiff for treble damages under the antitrust laws.

*Control of Prices.* The section of plaintiff's OTDE entitled "Control of Prices" at pages 61 to 111 relates entirely to the prices which the Presstite Division charged when it sold goods to buyers other than plaintiff, to the circumstances which prompted the Presstite Division to sell to Hastings on a direct basis, to the particulars of Presstite's commencement of direct sales to Filon, and to the arrangements with Elixir. Plaintiff concludes (p. 111, lines 17–23):

> "In light of the foregoing, who can doubt that defendants not only had the power to control prices, but deliberately used it to exclude the competition of plaintiff."

All of the matters in this section respecting control of price relate to the prices charged by the Presstite Division for its own goods. As the discussion in the section dealing with monopoly claims shows, there is nothing unlawful in Presstite's having that power and using it as it did, unless the Robinson-Patman Act was violated, but this section does not show any such violation, and neither does anything else. Nothing here, considered separately or with everything else, would support a claim by plaintiff for treble damages under the antitrust laws.

### Robinson-Patman Act Claims

In Count II, paragraphs 23–27, of the Amended Complaint, plaintiff sues for treble damages for injuries it allegedly sustained by reason of conduct of defendants alleged to violate section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13 (a).[6] In its Narrative, plaintiff referred to "discriminatory" prices charged by the Presstite Division but it did not even attempt to put together the elements of a prima facie case for treble damages based on price discrimination. In its Supplemental Response, plaintiff had only the following to say with respect to claims based on violation of the Robinson-Patman Act (p. 10, line 29 to p. 11, line 8):

> "Most if not all of the persons listed in this issue formulated by defendant were sold Presstite products at prices which discriminated against plaintiff. Appendix A shows the prices and discounts for Presstite products to the persons listed with this issue framed by defendants. The prices and discounts to the persons listed discriminate against plaintiff. Most of the persons listed were customers of plaintiff persuaded by defendants to purchase from them rather than plaintiff through the discriminatory prices offered to such customers. Plaintiff claims that the discriminatory prices utilized by defendants in winning away the business of Plaintiff's customers were part of defendants' violation of both Sections 1 and 2 of the Sherman Act."

---

6. See Footnote 3, supra.

By this statement, plaintiff seemed to abandon its claims of violation of the Robinson-Patman Act. Further, in its OTDE, plaintiff does not even mention the Robinson-Patman Act, much less make an attempt to show the elements of a case based on violation thereof.

■ Plaintiff has, however, submitted a considerable quantity of information about discounts offered and specific sales transactions in its Narrative and its OTDE. The Court has examined all of that information as well as the other information supplied by plaintiff to see whether anything could be found which would support a claim based on unlawful pricing under the Robinson-Patman Act. No such claim could be made on the basis of the material before the Court.

■ Plaintiff has tabulated considerable information in Appendix A to its Narrative relating to discounts granted by the Presstite Division to plaintiff and to others. Of course, only the actual net price charged various purchasers has any significance for comparison purposes (Rowe, Price Discrimination Under the Robinson-Patman Act 91–92 [1962]), and, if the prices actually charged and paid were not discriminatory, the fact that they were computed in differing ways should be immaterial.

■■ Plaintiff also refers to and describes price quotations offered to various persons by the Presstite Division from time to time. E. g., Narrative, p. 42, lines 21–27, p. 43, lines 15–17; Appendix A, pp. 24, 30, 32, 34, 37, 39, and 40. But quotations are wholly irrelevant to price discrimination under the Robinson-Patman Act, for it relates only to *actual completed* sales.

"A discrimination subject to the statutory prohibitions on discrimination in price or related promotional arrangements presupposes at least two actual and contemporaneous sale-purchase transactions at different prices or terms." Rowe, op. cit., supra, 45.

■ Plaintiff also includes information comparing the prices which plaintiff charged particular purchasers with the prices which the Presstite Division charged the same purchasers. The Robinson-Patman Act relates only to sales by a single seller to different purchasers (Ibid.), so that the price which plaintiff may have charged anyone is wholly immaterial to a determination of whether the prices of the Presstite Division were discriminatory.

The tabulations of the selling prices of the Presstite Division reported in Appendix A to plaintiff's Narrative are further defective in that prices for different sizes and configurations of the same basic product have been lumped together in a single listing without differentiation or description, with the result that the information is incongruous on its face and no comparison of prices is possible. For example, Appendix A, p. 35 reports, among other things, the following sales by the Presstite Division of product #975—two sales to Barker Foundry on 3/13/63 on one invoice, one at $0.6075/cft and the other at $1.9450/cft, two sales to plaintiff on 12/14/62 on one invoice at $0.42/cft and $0.6075/cft, and two other sales to plaintiff on 2/25/63 on one invoice at $0.42/cft and $3.105/cft. The other tabulations are similarly defective.

For the foregoing reasons, the information in plaintiff's Appendix A is not subject to rational let alone legal analysis, and it could not suffice even to show that the Presstite Division charged differing prices to different purchasers for the same commodity.

However, defendants collected in Exhibit III to their Memorandum in Support of the Motion to Eliminate Issues information as to buyer, product, size and configuration, quantity, total net price and net price per unit, and date of sale appearing on all of the Presstite invoices, both to plaintiff and to others, to which plaintiff referred in its Appendix A, except for a few Presstite invoices to plaintiff which plaintiff could not find. Issue number 25 in the Motion to Eliminate Issues named every person or entity to which plaintiff referred in its Narrative as a purchaser of goods

from the Presstite Division. That list included everyone so mentioned in the OTDE. Plaintiff claimed in its Preliminary Response that sales by the Presstite Division to all such persons violated the Robinson-Patman Act. The Court has analyzed all the information before it with respect to each person or entity named in Issue numbered 25 to see whether a Robinson-Patman claim could be sustained. The showings may conveniently be arranged in categories and will be discussed by such categories.

■ *No Price Data At All.* Plaintiff neither furnished nor referred to any data of any kind with respect to any sales by the Presstite Division of any products to any of the following persons:

Azusa Cooling Engineering,
Boething-Francis and Company,
Hehr Mfg. Company,
Inland Sash & Supply Company,
Harold A. Price & Co., Inc.

There is obviously nothing to show that such sales, if any, as the Presstite Division made to such persons, or any of them, violated the Robinson-Patman Act.

■ *No Comparative Price Data.* In Appendix A to its Narrative, plaintiff lists Presstite invoices with respect to sales by the Presstite Division to the following purchasers and the information from those invoices is tabulated in defendants' Exhibit III:

Department of Water and Power,
Harbor Boat Bldg. Co.,
Hughes Aircraft,
Pascoe Steel Corp.,
San Bernardino Vault Co.,
Treasure Chest.

The Presstite invoices with respect to sales to plaintiff which plaintiff designated in its Appendix A do not disclose any purchases by plaintiff of the products purchased by those purchasers at any time or at any price. With no sales to compare, there could be no proof of unlawful price discrimination adverse to plaintiff with respect to such persons.

■ *Price to Others Higher Than Price to Plaintiff.* The tabulations of the data from the invoices cited by plaintiff in its Appendix A indicate, to the extent that purchasers by plaintiff of the product are cited, that the Presstite Division charged higher prices to the following persons than it charged plaintiff for the same product on its purchasers which were closest in time to the sales to these other persons:

Advanced Structures,
Aerojet General,
Air Control Products,
Angelus Mobile Homes,
Associated Mfg. Co.,
Bournes Inc.,
Cervitor Kitchens Inc.,
Cupples Products Div.,
Disneyland Inc.,
Forest Lawn Memorial Park Association,
Gaffers & Sattler Company,
Glasteel Inc.,
Hunter Engineering Company,
Lasco Industries,
Recold Corporation,
Edwin Schwem,
Silverstreak Trailer Company,
Weber Showcase & Fixture Co., Inc.

Even if the differences in the prices to the above-named purchasers and to plaintiff for the same goods might be found to be unlawful price discriminations under the Robinson-Patman Act, plaintiff still would have no case, because it cannot show that the discriminations injured plaintiff. Clearly plaintiff was not required to pay too much for the goods it purchased from the Presstite Division, as it enjoyed the lower price in all cases. Nonetheless, plaintiff claims that the Presstite Division used "discriminatory" prices to win away plaintiff's customers (Supplemental Response, p. 11), but obviously, if those customers were won away from plaintiff on price, it was not because those prices "discriminate against plaintiff", not because the prices were *higher* than the price paid by plaintiff, but because those prices were *lower* than the prices at which plaintiff offered the same goods for sale. Furthermore,

the fact that the prices to those persons were different from the price to plaintiff had nothing to do with the winning away. Since plaintiff could never prove injury to its business or property by reason of Presstite's selling to these persons at a higher price than it charged plaintiff for the same goods, plaintiff could not have a claim for treble damages based on Robinson-Patman violations by reason of sales to such persons.

▇▇▇ *Price to Others Same as Price to Plaintiff.* The tabulations of data from the Presstite invoices cited by plaintiff in its Appendix A indicate that the prices the Presstite Division charged the following persons were the same as the prices the Presstite Division charged plaintiff for the same product on its purchases which were closest in time to the sales to these other persons:

Barker Foundry Supply Co.,
Filon Plastics Corp.,
Jones Foundry Supply Co.,
Lloyds Trailer Finishing, Inc.

As to all of these, there was no difference at all between the prices charged them and the prices charged plaintiff. There being no difference, there was no discrimination, and plaintiff can have no claim based on a violation of the Robinson-Patman Act.

▇▇▇ *Price to Others Lower than Price to Plaintiff.* The tabulations of information from the invoices cited by plaintiff indicated that the sale by the Presstite Division to plaintiff closest in time was at a higher price than the price paid by others in the following instances:

| | |
|---|---|
| Silvertown Co. | three sales, one product; |
| Ideal Industries | one sale, one product; |
| Yates Products | six sales, three products; |
| Elixir Paint & Lacquer Co. | ten sales, eight products; |
| Hastings Plastics | twenty-six sales, three products. |

---

Defendants concede that the above sales were of products of like grade and quality. Except in the case of Hastings Plastics, the sales to plaintiff and to the other purchasers were not particularly close in time, but the Court assumes them to have been "contemporaneous". On that showing, there is a possibility that as to forty-six sales, most of them modest in amount and involving small price differences, the prices could have been unlawful.

That showing does not, however, suffice to show a prima facie case for plaintiff. There is no showing as to the remaining elements of a Robinson-Patman Act violation. A price difference to two purchasers in respect of contemporaneous sales of goods of like grade and quality is not enough. Section 2a of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13, is explicit as to the elements of a violation:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or

prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: * * *"

There is no showing that any of the purchases as to which there were price differences were "in commerce", within the meaning of that section In all cases, both plaintiff and the other purchasers were in California. Since the Presstite Division manufactured many products at El Segundo, the sales of such products to such purchasers would not be "in commerce". There is no showing as to the source of the particular goods involved here, and there is nothing to support an inference that the source was other than El Segundo. There is no showing at all with respect to the effect of the discriminations, and nothing to support an inference that they had the requisite effect on competition. Thus, the proof would not support a finding that the Robinson-Patman Act had been violated. And, additionally, the evidence would not support a finding that plaintiff had been injured by the discriminations.

It is thus apparent that the materials before the Court would not support a claim by plaintiff for treble damages based on violations of the Robinson-Patman Act. Plaintiff was fully aware of the defects in its showing in this connection, which defendants had analyzed in detail in their memorandum, and yet it took no steps in its OTDE to supply the missing matters. The Court can find no support for a claim by plaintiff based on violation of the Robinson-Patman Act. The Motion to Eliminate Issues is granted as to all such claims, viz., issues numbered 25, 29 and 30.

## ALTERNATE GROUND FOR GRANTING MOTION TO ELIMINATE ISSUES

The Court's Order of June 1, 1967 required plaintiff to furnish information separately as to each of the claims specified in the Motion to Eliminate Issues, other than the five theretofore eliminated by admission. The order specifically provided that "Failure to furnish the foregoing information fully and completely with respect to any claim shall constitute an admission by plaintiff that it cannot prove such claim and abandons such claim". As noted above, plaintiff did not furnish the required information fully or completely as to any claim, but rather responded to no claim in particular, specifically stating that it was not furnishing complete information.

Pursuant to the terms of the Order of June 1, 1967, plaintiff has admitted that it cannot prove and has abandoned the claims described in issues numbered 4 through 8, inclusive, and 11 through 30, inclusive, and the Motion to Eliminate Issues is granted as to all such issues.

## SUMMARY JUDGMENT

As noted in the discussion headed "Motion to Eliminate Issues", the procedure followed here has been equivalent to a motion for summary judgment. The analysis has been the same as if the motion had been so entitled, and the tests applied have been the same. The result is essentially the same, namely, all issues are disposed of. In essence, the procedures differ only in that defendants' motion specified the issues, rather than having plaintiff make such specification in its response, and plaintiff's Narrative, OTDE and other presentations have been accepted in lieu of and as equivalent to affidavits. For purposes of the motion, the facts were and are undisputed, and they were and are taken to be the most favorable facts which were provable by or could properly be inferred from plaintiff's various statements of the evidence.

The Court suggested to the parties, before the instant procedure was adopted, that the procedure be by way of motion for summary judgment (Transcript, December 12, 1966, pp. 19–22), but for the reasons noted in the discussion of the Motion to Eliminate Issues, plaintiff's proposed procedure was adopted. On May 22, 1967, the Court essentially gave

plaintiff the option to abandon the instant procedure and to begin again with a formal summary judgment procedure, but plaintiff elected to continue. (Transcript, May 22, 1967, p. 45, line 20 to p. 46, line 7). Finally on July 31, 1967, the Court again offered the summary judgment procedure as an alternative:

"Therefore, it seems to me I have no alternative but to grant the motions to eliminate issues and to dismiss. Unless, that alternative to tell the defendants well, go prepare a motion for summary judgment, which seems to me would be a waste of the court's time and a waste of everybody's time since I am confident that Mr. Jansen would not want to supply any further information than you have already supplied in the OTDE. If, on the other hand, you desire to make an offer of proof as to additional facts which you have that would support opposition to a motion for summary judgment, perhaps I should entertain that at this time and see if it is sufficient to warrant denying these motions and putting the matter over for a motion for summary judgment.

"Do you have any further offers?

"MR. JANSEN: If it please the court, with the documents that have been identified, the depositions that have been taken, with the work that has been done by the plaintiff, we have made a sufficient showing to justify the case being submitted to a jury and we rest on the record." (Transcript, July 31, 1967, p. 12, line 24 to p. 13, line 19.)

The Federal Rules of Civil Procedure permit the Court to elect to treat motions directed to the merits, which consider matters outside the pleadings, as motions for summary judgment under Rule 56, regardless of the title given to the motion by the moving party. Rules 12(b) and 12(c) expressly authorize this in the case of motions to dismiss and motions for judgment on the plead-

ings. By analogy, the motion to eliminate issues should be similarly treated, and plaintiff's statement that it would offer nothing further in opposition to a motion for summary judgment constitutes consent to such treatment.

■ Under these circumstances, the Court has elected to treat the Motion to Eliminate Issues as a motion for summary judgment under Rule 56, and, for the reasons stated in the discussion of the merits, the motion is granted.

The procedural posture of the case has been discussed at length and the judgment for defendants on the merits has been made on alternate procedural grounds for the following reasons. It is apparent from the materials before the Court, and from plaintiff's refusal to produce anything more after being told it would lose on the materials presented, that plaintiff simply does not have a case against defendants. As a matter of common sense, defendants should have judgment at the first opportunity, and in a matter involving the expenditure of the least possible time, effort and money of the Court, counsel and the parties. There is simply no merit in further proceedings. Further or different pretrial motions or proceedings would be wasteful, be of benefit to no one and reach the same result. It would be farcical to present these matters to a jury, knowing all the while that a verdict would be directed. The procedure which was adopted was entirely valid and proper, and, with the cooperation of the parties, it could have been an extremely useful method for analyzing and simplifying the case on the merits, and it may yet so serve the Court and prove to be such in another setting. However, since plaintiff did not follow the procedure it suggested, the Court has in fact been forced to consider, and has considered, the mass of material as a whole as on a motion by defendants for summary judgment where only the broadest issues were specified by plaintiff. In these circumstances, the Court's work and judg-

ment should be protected against doubts as to procedure or whether the Court relied on a Rule which another might think inapplicable, or failed to rely on an applicable Rule. The motion to eliminate issues is granted in reliance on Rules 16, 56, 12 and 83, and all possible issues having been eliminated, judgment is given for defendants.

Moreover, the pleadings, depositions, answers to interrogatories and admissions, together with plaintiff's various statements of evidence, including its Narrative and supporting Appendices, its OTDE and its other presentations of evidentiary material clearly show, even when taken in the light most favorable to plaintiff and drawing all possible inferences in favor of plaintiff, that "there is no genuine issue as to any material fact" and that defendants are "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. Therefore, the Court has also elected to treat the motion as being a motion for summary judgment under Rule 56 and is granting it as well.

Apart from the merits, the Court is also dismissing the case under Rule 41(b) because of plaintiff's persistent refusal to comply with the Court's Order of June 1, 1967.

The foregoing shall and does constitute the findings of fact and conclusions of law herein, if and as required by Fed.R. Civ.P. 52.

Judgment shall be entered, therefore, dismissing the complaint and each and every cause of action and claim for relief therein contained, with prejudice, pursuant to Fed.R.Civ.P. 41(b), and further granting summary judgment in favor of defendants and against plaintiff, dismissing the complaint and each and every cause of action and claim for relief therein contained, on the merits.

Let judgment be entered accordingly.